# Illinois Official Reports

## Appellate Court

---

### *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245

---

| | |
|---|---|
| Appellate Court Caption | MATTHEW BRUNTJEN, Plaintiff-Appellee, v. BETHALTO PIZZA, LLC, d/b/a Imo's Pizza; and IMO'S FRANCHISING, INC., Defendants-Appellants (Kenneth Lyerla; Lisa Lyerla; Jeremiah Greene; Jason Yelton; Metro East Distributing, Inc.; Leonard Cummings, Jr.; and Tresorella's, Inc., Defendants). |
| District & No. | Fifth District<br>Docket No. 5-12-0245 |
| Filed | September 15, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the severe brain injuries plaintiff suffered when defendants' pizza delivery vehicle crossed a center line and crashed into a van in which plaintiff was a passenger, the verdict for plaintiff was affirmed where the trial court did not abuse its discretion in denying defendants' motion for a mistrial based on the claim that they were deprived of their statutory allocation of peremptory challenges when certain codefendants used their challenges for plaintiff's benefit and were dismissed pursuant to a settlement before the trial started, the pizza shop's franchisor was properly found liable due to its own negligence as well as under a theory of vicarious liability, the jury's awards for past and future medical expenses and past and future lost wages were affirmed, and the denial of defendants' request for remittitur or a new trial on damages was not an abuse of discretion. |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 10-L-577; the Hon. A.A. Matoesian, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Gordon R. Broom, Theodore J. MacDonald, Jr., and Michael L. Young, all of HeplerBroom, LLC, of Edwardsville, and Roderick T. Dunne and Linda J. Carwile, both of Karbal, Cohen, Economou, Silk & Dunne, LLC, of Chicago, for appellant Bethalto Pizza, LLC. |
| | Russell K. Scott, of Greensfelder, Hemker & Gale, P.C., of Belleville, for appellant Imo's Franchising, Inc. |
| | Roy C. Dripps, Charles W. Armbruster III, and Michael T. Blotevogel, all of Armbruster, Dripps, Winterscheidt & Blotevogel, of Alton, for appellee. |
| Panel | JUSTICE CHAPMAN delivered the judgment of the court, with opinion. Justice Stewart concurred in the judgment and opinion. Justice Spomer dissented, with opinion. |

**OPINION**

¶ 1    The defendants, Bethalto Pizza, LLC, doing business as Imo's Pizza (Bethalto), and Imo's Franchising, Inc. (Imo's), appeal the December 13, 2011, judgment entered by the circuit court of Madison County after a jury verdict in favor of the plaintiff, Matthew Bruntjen, in the amount of $2,284,500.68, for damages he sustained in an automobile accident. The defendants' posttrial motions were denied on May 18, 2012. The defendants raise a number of issues on appeal. We affirm.

¶ 2                                    I. FACTS

¶ 3    On March 31, 2011, Matthew Bruntjen filed an amended complaint against, *inter alios*, Kenneth Lyerla, Bethalto, and Imo's. According to the amended complaint, on August 17, 2009, Kenneth Lyerla was delivering a pizza when he crossed the center line and hit the van in which the plaintiff was a passenger, causing a severe brain injury. The amended complaint alleged that Lyerla was an employee of Bethalto and that Imo's was the franchising corporation that established policies and procedures for all Imo's franchisees, including Bethalto. The amended complaint included a count alleging vicarious liability against Imo's as well as a count alleging direct negligence against Imo's. In the direct negligence count, the plaintiff alleged that Imo's created an environment with its franchisees that put timely delivery of food products ahead of public safety and allowed Lyerla to operate a motor

- 2 -

vehicle to deliver pizzas on its behalf without first ascertaining that he was capable of safely operating a motor vehicle.

¶ 4   Lyerla conceded that his negligence caused the automobile accident at issue, and Bethalto admitted that it was responsible for the acts of Lyerla as his employer. However, Imo's, as a franchisor, contested its duty to the plaintiff via a motion to dismiss, a motion for summary judgment, and a motion for a directed verdict, all of which were denied. Subsequently, defendants filed motions for a mistrial, judgment notwithstanding the verdict, remittitur or a new trial on the issue of damages, and a new trial on all issues. The court's denial of these motions forms the basis of many of the issues raised in this appeal. As defendants' claims of error are numerous, we will further develop the facts necessary for disposition as we address each issue on appeal.

¶ 5   Imo's and Bethalto shared the same counsel at trial, but are represented by separate counsel on appeal. Imo's has expressly adopted and incorporated all arguments and points of error raised by Bethalto in this appeal, in addition to the arguments and points raised in its own brief.

¶ 6                                    II. ANALYSIS
¶ 7                              A. Peremptory Challenges
¶ 8   The plaintiff named several additional defendants in the amended complaint: (1) Lisa Lyerla, the owner of the vehicle Kenneth Lyerla was driving at the time of the accident; (2) Jeremiah Greene, the driver of the van in which the plaintiff was a passenger; (3) Jason Yelton, the owner of the van; and (4) Metro East Distributing, Inc. (Metro East), the plaintiff's employer. When jury selection commenced, four defense attorneys participated. Lisa and Kenneth Lyerla were represented by one attorney; Jeremiah Greene and Jason Yelton were represented by a second attorney; Metro East was represented by a third attorney; and Bethalto and Imo's were represented by a fourth attorney. The trial court awarded eight peremptory challenges to the plaintiff and distributed eight peremptory challenges among the defendants by awarding two challenges to each of the four attorneys representing the defendants.

¶ 9   Before jury selection began, counsel for defendant Metro East stated as follows:

"I do want to state for the record–this is John Wendler. I represent Metro East Distributing. My understanding is that Metro East has two strikes, and I'm going to use them to the best advantage to get my client out of this case, which may–it could or might end up me striking people that I normally wouldn't strike as defendant. And even if I, to get a dismissal for my case, I need to work in concord with the plaintiff if I had to. So, I want to put it out in the open so anyone can make an objection."

¶ 10   Counsel for Bethalto and Imo's then stated:

"I'm going to object if any of the parties who are named as a defendant are dismissed immediately after jury selection. I think that that would demonstrate gamesmanship and it would influence the jury selection process. So, I just want to make that clear. I think that by now the plaintiff should know who they're going to leave in the case or take out of the case."

¶ 11   During the empanelment of the first four members of the jury, counsel for Bethalto and Imo's objected and moved for a mistrial, stating that plaintiff's counsel had just instructed

Metro East on how to exercise its challenge. Counsel then went on to state that he believed that there had been some kind of deal struck where some of the defendants were going to use their challenges for the benefit of plaintiff in order to gain dismissals. The court denied counsel's motion for mistrial. Shortly thereafter, the court empanelled the first four jurors. This panel was accepted by counsel for Bethalto and Imo's. At that point, counsel still had an additional peremptory challenge. Jury selection concluded without any further objections.

¶ 12        The next morning, Metro East, Yelton, and Greene filed a joint motion for a good-faith finding of settlement, informing the court that the plaintiff had agreed to their dismissal in exchange for $20,000. Counsel for Bethalto and Imo's then stated that he was renewing his motion for mistrial. He also stated that he was objecting to the settlement as not being made in good faith because of how the challenges were exercised. Counsel for plaintiff stated that the settlement was in good faith and that the settlement amount was all the insurance coverage available. Plaintiff's counsel went on to state that none of the remaining defendants (Bethalto, Imo's, or Kenneth Lyerla) had identified any juror who was objectionable or how their rights were violated. Counsel for Bethalto and Imo's was then asked by the judge, "Is it your position that they should be kept in this trial throughout the whole thing, even though they have settled?" Counsel answered, "I am objecting to the good[-]faith finding."

¶ 13        Counsel for Metro East responded:

> "Everything done here was for the purpose of defending our client. They can no more claim that we can't take any and every avenue to defend our clients, than we can claim they did. Everything has been in the open. They had every opportunity to object to any jurors that were on the panel; they didn't do it."

The judge then asked Bethalto and Imo's counsel, "So what do you suggest?" Counsel responded, "I suggest keeping them in." The judge approved the settlement. Lisa Lyerla was subsequently dismissed from the suit. The case proceeded to trial against Kenneth Lyerla, Bethalto, and Imo's. Kenneth Lyerla was dismissed sometime prior to verdict.

¶ 14        Bethalto and Imo's contend that a new trial is warranted because they were deprived of their statutory allocation of peremptory challenges when two of the codefendant groups used their peremptory challenges for the benefit of plaintiff. Plaintiff responds that defendants were not deprived of their statutory allocations, because each side agreed to the allocation of peremptory challenges among themselves in compliance with the plain language of the statute.

¶ 15        Defendants based their motion for new trial, in part, on the trial court's denial of their motion for a mistrial. " 'Generally, a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice.' " *Lovell v. Sarah Bush Lincoln Health Center*, 397 Ill. App. 3d 890, 899 (2010) (quoting *People v. Bishop*, 218 Ill. 2d 232, 251 (2006)). A trial court's denial of a motion for a mistrial will not be disturbed unless there has been a clear abuse of discretion. *Id.*

¶ 16        Section 2-1106 of the Illinois Code of Civil Procedure provides, in relevant part:

> "Each side shall be entitled to 5 peremptory challenges. If there is more than one party on any side, the court may allow each side additional peremptory challenges, not to exceed 3, on account of each additional party on the side having the greatest number of parties. Each side shall be allowed an equal number of peremptory

- 4 -

challenges. If the parties on a side are unable to agree upon the allocation of peremptory challenges among themselves, the allocation shall be determined by the court." 735 ILCS 5/2-1106(a) (West 2010).

While defendants couch their argument in terms of not receiving their statutory allocation, we agree with plaintiff that the plain language of the statute was adhered to because each side was given the same number of challenges and the defendants agreed to the allocation among themselves.

¶ 17 Defendants essentially concede this point when they state in their brief that "the trial court correctly allocated eight peremptory challenges to each side, eight challenges to plaintiff and eight challenges to split among the four defendants." What counsel meant was that the defendants' maximum allocation of eight peremptory challenges was divided evenly among the four *groups* of defendants, represented by four different attorneys. As both Imo's and Bethalto were represented by one attorney, they received two challenges.

¶ 18 We note that many of the cases cited by defendants are ones where the court assigned an unequal number of challenges to each side. To the extent that they rely on that issue, we find those cases of little value in our analysis. Most notably, defendants cite to *Schultz v. Gilbert*, where the trial court incorrectly interpreted the statute to allow extra peremptory challenges to additional parties on a plaintiff's side without affording the same ratio to defendants. *Schultz v. Gilbert*, 300 Ill. App. 417, 420-21 (1939). We also note that defendants cite to a number of cases from foreign jurisdictions, which we decline to discuss as we believe Illinois case law adequately addresses and controls the issues before us.

¶ 19 We believe defendants' real point of contention is *how* the allocated challenges were utilized by the settling codefendants–that they were utilized for the benefit of plaintiff rather than the benefit of defendants, Bethalto and Imo's. In defendants' words, "In essence, the co-defendants were actually in plaintiff's camp, which destroyed the adversary nature of the proceeding and promoted fundamental unfairness." It is this argument that we will address.

¶ 20 At trial, Bethalto and Imo's counsel moved for a mistrial and, in the alternative, for a denial of a good-faith settlement of the codefendants. However, at no time did counsel request that the court reallocate the peremptory challenges, as provided for by statute in the event parties on a side are unable to agree on the allocation. Even after the court asked defendants' counsel what he suggested doing, counsel opted to keep the panel intact, instead repeatedly moving for a mistrial and urging the court not to approve the settlement. Bethalto and Imo's cannot now claim that they were denied equal allocation of peremptory challenges based on an alleged *de facto* realignment of the sides when they did not request that relief below. A court properly denies the request for a mistrial when less drastic remedies are not pursued. *People v. Hood*, 213 Ill. 2d 244, 262-63 (2004). Also of note, Bethalto and Imo's do not claim error on appeal as to the good-faith settlement finding–the other form of relief sought in the trial court.

¶ 21 In *O'Donnell v. Holy Family Hospital*, a similar claim was made. *O'Donnell v. Holy Family Hospital*, 289 Ill. App. 3d 634, 649 (1997). There, the trial court refused to dismiss for cause two persons who indicated that they could not award millions of dollars in damages. Plaintiffs claimed on appeal that they were forced to exhaust all their peremptory challenges and forced to accept the objectionable jurors. *Id.* In rejecting this claim, the court stated:

- 5 -

"We need not decide whether refusal to dismiss the two jurors for cause was error. Plaintiffs' counsel never requested additional peremptories or informed the court that plaintiffs were being forced to accept objectionable jurors. Nor do plaintiffs attempt to explain why the jurors they were forced to accept were objectionable. Plaintiffs' simple assertion of prejudice is insufficient grounds for finding reversible error." *Id.*

¶ 22    Similarly, in *Lange v. Freund*, the court refused to review a claim that plaintiffs were denied a fair and impartial jury where the trial court had announced before jury selection began that if a four-member panel had not been completed and sworn by the end of the day, all jurors in that panel would be dismissed and they would begin anew the next day. *Lange v. Freund*, 367 Ill. App. 3d 641, 648 (2006). Neither party objected to this rule. *Id.* The four-member panel was not sworn by the end of the day, and the panel members were dismissed. *Id.* Neither party objected at that time or when jury selection resumed the next day and the remainder of the jury was empanelled. *Id.* The appellate court stated, "Since the Langes did not object to the court's announcement of its rule, to its application of the rule at the time the three jurors from the incomplete second panel were dismissed, or to its assessment of the parties' remaining number of peremptory challenges, they have waived the issue." *Id.* at 648-49.

¶ 23    Here, Bethalto and Imo's not only failed to ask for the relief afforded by statute–a reallocation of challenges–they also failed to object to any jurors they now claim were objectionable. Relief not requested in the trial court may not be considered on appeal. *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 41. Because defendants' counsel did not identify any objectionable jurors at trial, we do not know whether they had any challenges left when the objectionable jurors were seated. However, a review of the record does reveal that Bethalto and Imo's had one challenge left at the point in time when the first four members of the jury were empanelled and the defendants moved for a mistrial. The failure to use a peremptory challenge on an objectionable juror waives the issue on appeal. *People v. Bowens*, 407 Ill. App. 3d 1094, 1100 (2011). We find that the claimed error, if in fact it was an error, has been forfeited.

¶ 24    Forfeiture notwithstanding, the erroneous denial of a peremptory challenge does not require reversal unless the defendant can show that a biased or otherwise unqualified juror rendered a verdict against him. *Jimenez v. City of Chicago*, 732 F.3d 710, 714 (7th Cir. 2013). "Prejudice in the jury selection process is not shown by the mere assertion that a party would have preferred different members of the jury; Illinois courts have instead required a showing that a party was forced to accept a juror that was objectionable and was unable to excuse that juror due to the lack of peremptory challenges." *Lange*, 367 Ill. App. 3d at 649 (citing *O'Donnell*, 289 Ill. App. 3d at 649, and *Snyder v. Poplett*, 98 Ill. App. 3d 359, 365 (1981)). Even a *Batson* challenge (*Batson v. Kentucky*, 476 U.S. 79 (1986)) is subject to a harmless error analysis without a showing that a biased juror was seated. *Jimenez*, 732 F.3d at 714. Bethalto and Imo's argue, however, that "[t]he issue is not that objectionable jurors were empanelled," but that through plaintiff's manipulation with the jury selection process potentially "pro-defense" jurors were removed, resulting in a "pro-plaintiff" jury. This position is untenable and not supported by case law. "Generally, the nature of a peremptory challenge suggests it may be used for any reason." *Tucker v. Illinois Power Co.*, 217 Ill. App. 3d 748, 751 (1991). "The right of peremptory challenge is a right to exclude jurors, not to

select them. It enables a party to say who shall not try his case, but it does not enable him to select the particular jurors by whom he wishes his case tried." *Schultz*, 300 Ill. App. at 422. Bethalto and Imo's were given the right to exclude the jurors that they did not want to try their case through their allotment of challenges. Defendants' argument assumes that they also have the right to control how other parties on the same side choose to use their challenges. Defendants have not cited a case that supports this proposition. Defendants' presumption of a unified defense may be an expectation, but does not equate to an entitlement. *Simpson v. Matthews*, 339 Ill. App. 3d 322, 332 (2003).

¶ 25    Furthermore, the record reveals that Bethalto and Imo's had filed cross-claims against the settling defendants, which contributed to an adversarial environment. There is no requirement that once the parties on a side "agree upon the allocation of peremptory challenges among themselves" (735 ILCS 5/2-1106(a) (West 2010)), the parties must also agree on *how* the allocated challenges shall be used. "[T]he right to a fair trial does not mean an ideal trial or a trial under circumstances most advantageous to either party." *Simpson*, 339 Ill. App. 3d at 332.

¶ 26    Moreover, unless shown otherwise, we must presume that the jurors were impartial. Apart from defendants' nebulous claim that a "pro-plaintiff" jury was empanelled, they have made no showing that anything but a fair and impartial jury decided the case to conclusion. To find otherwise would open up any verdict adverse to the party in question.

¶ 27    We are equally unpersuaded by defendants' analogy to a "Mary Carter agreement." As counsel concedes, the settlements at issue here were not "technically" Mary Carter agreements, and thus we need not analyze them as such. See *Simpson*, 339 Ill. App. 3d at 328-29. We believe, however, that defendants' claim that the settlements were akin to a Mary Carter agreement also lacks merit. The settling defendants were forthright about not aligning with Bethalto and Imo's, and they used their challenges as they saw fit.

¶ 28    Finally, we find no basis for defendants' accusation that a fraud was committed on the trial court or that plaintiff's counsel violated the rules of professional conduct.

¶ 29    We believe that the transparency of the jury selection proceedings adequately protected Bethalto's and Imo's right to a fair trial, while at the same time promoting the court's policy to encourage settlements. We find that the trial court did not abuse its discretion in denying defendants' motion for a mistrial.

¶ 30                                    B. Imo's Liability

¶ 31    Imo's contends that the trial court erred in denying its section 2-619 (735 ILCS 5/2-619 (West 2010)) motion to dismiss plaintiff's amended complaint, its motion for summary judgment, and its motions for directed verdict because plaintiff failed to plead and prove, as a matter of law, that Imo's owed him a duty of care or that the breach of any duty was a proximate cause of his alleged injury. Imo's also contends that plaintiff failed to prove that it was liable under a theory of *respondeat superior*. Imo's therefore contends that it was entitled to a judgment notwithstanding the verdict. In the alternative, Imo's asks for a new trial.

¶ 32    We apply a *de novo* standard of review to a trial court's denial of a motion for summary judgment, motion for directed verdict, and motion for judgment *n.o.v. Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37; *McClure v. Owens Corning Fiberglas*

*Corp.*, 188 Ill. 2d 102, 132 (1999). "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We apply an abuse of discretion standard to a motion for new trial. *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992). A trial court has abused its discretion when the verdict is against the manifest weight of the evidence. *Id.* A verdict is against the manifest weight of the evidence where the opposite result is clearly evident or the jury's findings are unreasonable, arbitrary, and not based upon the evidence. *Id.* at 454.

¶ 33     As previously discussed, plaintiff's complaint contained counts alleging that Imo's was liable due to its own negligence as well as on a theory of vicarious liability. The jury found Imo's liable on both counts.

¶ 34                                   1. Direct Negligence

¶ 35     As a threshold matter, notwithstanding Imo's contention that plaintiff failed to *plead* and prove that Imo's owed him a duty of care, we do not address the sufficiency of the complaint, as Imo's attacks on plaintiff's pleadings were by a section 2-619 petition, thereby admitting the legal sufficiency of the complaint. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 31.

¶ 36     Imo's argues that plaintiff failed to plead and prove that Imo's owed a duty to plaintiff. Imo's general contention is that, as a matter of law, it owed no duty of care to plaintiff because there was no relationship between plaintiff and Imo's giving rise to a direct duty to protect plaintiff from the conduct of a third person. Plaintiff contends that every person owes a duty of ordinary care to guard against injuries that are the foreseeable risk of a defendant's conduct. He argues that he pled and proved that Imo's created a foreseeable risk of injury. Plaintiff also argues that he demonstrated that Imo's assumed the risk of protecting him against harm caused by Lyerla. Imo's contends that plaintiff failed to establish a duty under either theory. Imo's further argues that if there was a duty, plaintiff failed to show that the breach of a duty was the proximate cause of his alleged injury.

¶ 37                                   a. Duty of Care

¶ 38     It is well settled Illinois law that " 'every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons.' " *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 19 (quoting *Widlowski v. Durkee Foods*, 138 Ill. 2d 369, 373 (1990)). "Thus, where a defendant's course of action creates a foreseeable risk of injury, the defendant has a duty to protect others from such injury." *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 21; *Simpkins*, 2012 IL 110662, ¶ 19.

¶ 39     The criterion in a duty analysis is whether a plaintiff and a defendant stood in such a relationship to each other that the law imposed an obligation upon the defendant to act for the protection of the plaintiff. *Simpkins*, 2012 IL 110662, ¶ 18; *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436 (2006). However, there is no requirement that the relationship between the parties be a direct one. *Doe-3*, 2012 IL 112479, ¶ 22. The relationship test is answered

through the analysis of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Id*. The analysis of these factors depends on policies inherent in the factors, and the weight given to each factor depends on the circumstances of the particular case. *Id.*

¶ 40    The duty analysis begins with the question of whether the defendant by act or omission created or contributed to a risk of harm to the plaintiff. *Simpkins*, 2012 IL 110662, ¶ 21. If the answer to that question is yes, then we proceed to analyze the four relationship factors stated above. If the answer is no, then we address whether there were any special relationships that establish duty between the defendant and the plaintiff, *i.e.*, common carrier/passenger, innkeeper/guest, custodian/ward, and possessor of land who holds it open to the public/member of the public who enters in response to the possessor's invitation. *Id*. ¶ 20 (citing *Marshall*, 222 Ill. 2d at 438).

¶ 41    Where the act or omission of the defendant did *not* contribute to a risk of harm to the plaintiff, the absence of a special relationship negates any duty to take affirmative action to protect the plaintiff. Generally, there is no duty to control the conduct of a third person to prevent him from causing physical harm to another. *Hollywood Trucking, Inc. v. Watters*, 385 Ill. App. 3d 237, 242 (2008); see also Restatement (Second) of Torts § 314 (1965). However, this rule does not apply where an act or omission of the defendant *does* contribute to the risk of harm. "Restatement Third of Torts (Liability for Physical and Emotional Harm) § 37 (2010) now covers this ground and clarifies the Second Restatement's rule by making it clear that the defendant does not escape liability if he has himself created a risk of physical harm." 2 Dan B. Dobbs, The Law of Torts § 405, at 652 n.3 (2d ed. 2011). "[T]he no-duty-to-control rule has no logical application when the defendant is affirmatively negligent in creating a risk of harm to the plaintiff through the instrumentality of another or otherwise." *Id.* § 414, at 700.

¶ 42    Turning to the instant case, we ask the threshold question whether Imo's conduct by act or omission created or contributed to a risk of harm to plaintiff. Plaintiff alleges that Imo's actively contributed to a risk of harm to the plaintiff by (a) establishing an unusually large delivery area for the Bethalto store; (b) requiring "timely" delivery; (c) requiring Bethalto to have Lyerla sign a contract stating he could be terminated for failing to deliver pizzas expeditiously; and (d) creating a financial incentive to young drivers to drive at unsafe speeds. He alleges that this conduct created or contributed to a condition of unsafe driving that put plaintiff traveling on the same roads as Lyerla at risk of harm. Because plaintiff alleges that Imo's conduct contributed to the risk of harm, we look to the four relationship factors to determine whether this conduct gave rise to a legally cognizant duty.

¶ 43    The first factor we consider is the reasonable foreseeability of the injury. Imo's argues that it "merely created a scenario under which Bethalto would place its employees upon the roadways to deliver pizzas." As such, Imo's contends, there would be no reason for it to expect that an employee of its franchisee would operate a vehicle in a negligent manner. Furthermore, Imo's argues that it placed an emphasis on safety in its franchise agreement, manual, and driver contract.

¶ 44    "Foreseeability of harm, in connection with a duty, is not a magical concept that ignores common sense." *St. Paul Insurance Co. of Illinois v. Estate of Venute*, 275 Ill. App. 3d 432, 436 (1995). A person has a greater reason to anticipate negligence than criminal conduct.

*Marshall*, 222 Ill. 2d at 440 (citing Restatement (Second) of Torts § 302B cmt. d (1965)). It is unrealistic to posit that Imo's had no reason to expect that a franchisee's employee would operate a vehicle negligently. Imo's knew or should have known that from time to time vehicle-related accidents would occur involving its franchisee's delivery drivers and that some of those accidents would be attributable to the fault of the delivery driver. We may assume the general foreseeability of occasional accidents involving pizza delivery drivers, who will be at fault some of the time. See *Marshall*, 222 Ill. 2d at 442 (recognizing the reasonable foreseeability of harm caused by automobile accidents given the pervasiveness of automobiles, roadways, and parking lots). The relevant query then becomes whether it was reasonably foreseeable that Imo's actions would or could affect the conduct of Lyerla, thereby contributing to the risk of harm to plaintiff.

¶ 45 Restatement (Second) of Torts section 303 states, "An act is negligent if the actor intends it to affect, or realizes or should realize that it is likely to affect, the conduct of another, a third person, or an animal in such a manner as to create an unreasonable risk of harm to the other." Restatement (Second) of Torts § 303 (1965). Imo's argues that because it emphasizes driver safety, the expectation by Imo's was that "a franchisee's delivery personnel will act in a reasonably safe manner and never sacrifice safety for speedy delivery."

¶ 46 Nineteen-year-old Kenneth Lyerla crossed the center line and hit the vehicle in which plaintiff was a passenger head-on. An eyewitness testified that Lyerla was speeding–"flying down the road"–when he swerved to avoid a stopped vehicle. The witness testified that Lyerla did not appear to reduce his speed before impact. At the time, he was in the process of a pizza delivery for his employer, Bethalto Pizza.

¶ 47 Imo's operating manual, franchise agreement, and driver contract were admitted into evidence. Imo's policies emphasized speed of delivery– "as soon as possible." Imo's required a driver contract that allowed for termination for failure to make "timely" deliveries or with "expedition." Imo's compensation scheme did not require drivers to be paid an hourly rate, but did require that they make minimum wage. Drivers could make more than minimum wage only by delivering as many pizzas an hour as possible, because they could keep delivery fees and tips. Imo's benefited by drivers making as many deliveries as fast as possible because its franchisees paid it a monthly continuing fee license equal to 4% of their sales. There was no bonus for safe driving or any safe driving training or program.

¶ 48 Imo's required its franchisees to provide pizza deliveries, and it allowed the franchisee to determine the size of the delivery area beyond a three-quarter-mile radius from each restaurant. The delivery range for the Bethalto franchise was up to 10 miles. The further away the delivery, the less money drivers could potentially make, as drivers could drive as long as 15 minutes in one direction. Consequently, drivers could deliver as few as two pizzas an hour and make less than minimum wage on delivery fees and tips.

¶ 49 Imo's had a written policy that drivers must have fewer than three moving violations in the three preceding years. Imo's retained the right to monitor and enforce compliance with its policies, but did not have anyone assigned to check on driver's records. Lyerla had three moving violations in less than the three years preceding the accident. According to Imo's own mandatory written policy, Lyerla should not have been delivering pizzas.

¶ 50 We cannot say as a matter of law that it was unforeseeable that delivery drivers would sacrifice safety for speedy deliveries given the large size of the delivery area; the financial incentive to maximize deliveries; the young age and inexperience of some of its drivers; the

- 10 -

requirement that deliveries were to be "timely," "efficient," and made "as soon as possible"; and the fact that the driver contract allowed Imo's to terminate a driver for not delivering pizzas quickly enough. The fact that Imo's required delivery drivers have fewer than three moving violations also evidenced knowledge that unsafe driving could contribute to accidents.

¶ 51    We next consider the likelihood of the injury. The injuries suffered by plaintiff were not remote or unlikely under the circumstances as a matter of law. Imo's requirement of pizza deliveries placed its franchise drivers on the road with other vehicles. Defendant Bethalto has admitted that Lyerla's negligent driving was the cause of the accident whereby plaintiff was injured. Had Imo's enforced its own policy, it would have discovered Lyerla's history of moving violations and not placed him on the road delivering pizzas. Having determined that the risk of harm was foreseeable as a matter of law, we likewise find that the plaintiff's injury was reasonably likely to arise from a pizza delivery driver with past moving violations who was speeding to deliver a pizza. See *Doe-3*, 2012 IL 112479, ¶ 33.

¶ 52    The next factor we address is the magnitude of the burden of guarding against the injury. Imo's argues that the burden of guarding against the injury here would be great, requiring that it either cease deliveries or control the manner and method of delivery in all of its 94 franchise locations. Plaintiff counters with the argument that the magnitude of the harm of speeding delivery drivers is great, including death and serious injury, while the burden of guarding against such injuries would not be great.

¶ 53    We agree with plaintiff that the burden of guarding against the injury would not be great when balanced with the seriousness of auto-related injuries caused by speeding delivery drivers. We believe that the precautionary measures that Imo's could undertake are not so onerous as to cause defendant to cease pizza deliveries or require it to micromanage its 94 franchise locations. Imo's could remove the financial incentive that encourages drivers to maximize the number of deliveries in an hour; remove language from the driver contract that would allow Imo's to terminate drivers who do not deliver pizzas with "expedition"; remove language from the franchise agreement, manual, and driver contract that emphasizes and requires deliveries be made quickly; reduce the size of the delivery area; allow the franchisee to determine whether or not to provide deliveries; incentivize safe deliveries; provide safe driving training; and enforce its own safety polices. Most notably in this instance, enforcement of its own policy–that a driver could not have three or more moving violations and deliver pizzas–would have precluded Lyerla from delivering pizzas. None of these alternatives would impose an undue burden on Imo's.

¶ 54    The final relationship factor is the consequences of placing the burden on the defendant. Imo's arguments that it would be forced out of business if it stopped pizza deliveries and had to micromanage its 94 franchises are speculative at best. This is particularly true since the precautionary measures proposed to reduce the risk of harm to plaintiff would not require drastic measures. We adhere to the language in *Marshall* wherein the court cautioned against conflating duty and breach, recognizing a duty of care does not equate with a finding of breach or proximate cause: "In short, merely concluding that the duty applies does not constitute an automatic, broad-based declaration of negligence liability." *Marshall*, 222 Ill. 2d at 443. We find that plaintiff proved circumstances that gave rise to a duty owed by Imo's to plaintiff in this case.

¶ 55                                    b. Assumption of Duty

¶ 56        Imo's argues additionally that plaintiff failed to prove that it voluntarily assumed a duty
of care toward plaintiff. As we have just discussed, if a defendant has created or contributed
to the risk of harm to a plaintiff, there is no additional requirement that an independent or
direct relationship be shown to establish a duty. *Simpkins*, 2012 IL 110662, ¶ 19. Imo's
argues, however, that to impose duty in a franchisor-franchisee case, there must be one of the
four recognized special relationships or a voluntary undertaking. Imo's relies extensively on
*Castro v. Brown's Chicken & Pasta, Inc.*, 314 Ill. App. 3d 542 (2000), for this argument. We
disagree and find Imo's reliance on *Castro* misplaced.

¶ 57        *Castro* involved the murder of several restaurant patrons at a Brown's Chicken & Pasta
franchise. Castro, an administrator of one of the decedents' estates, brought suit against the
franchisor, claiming that it owed a duty toward the plaintiff because it "exercised control
over the franchisee by virtue of the franchise agreement and by recommending safety rules
for the employees." *Id.* at 544. The trial court dismissed the complaint because it did not
plead a voluntary undertaking. *Id.* The court subsequently dismissed plaintiff's amended
complaint on a motion for summary judgment as to proximate cause, but not as to the
amended voluntary undertaking count. *Id.* at 546.

¶ 58        On cross-appeals, the appellate court affirmed the dismissal as to proximate cause and
reversed and dismissed the voluntary undertaking count. The court found that the franchisee
had retained total control over the day-to-day operations of the restaurant. *Id.* at 552. The
court held that the franchisor did not voluntarily undertake to provide security at the
restaurant. *Id.* In making this determination, the court noted: "Clearly, there is no legal duty
on the part of Brown's because no special relationship exists between it and plaintiff.
Therefore, the issue becomes whether Brown's was negligent in voluntarily undertaking to
provide security for the plaintiffs." *Id.* at 547.

¶ 59        The most notable distinction between *Castro* and the instant case is that *Castro* involved
a criminal act. In general, there is no affirmative duty to protect a third party from a criminal
act. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). To the extent that
this language is read to make a finding of a special relationship or a voluntary undertaking an
*absolute* prerequisite as a matter of law to the recognition of a duty in a franchisor-franchisee
case, we believe this interpretation conflicts with the principles our supreme court set down
in *Marshall* and *Simpkins*. *Simpkins* instructs that if a course of action creates or contributes
to a foreseeable risk of injury, that individual has a duty to protect others from such injury.
*Simpkins*, 2012 IL 110662, ¶ 19. Consequently, duty does not necessarily hinge on a special
relationship or a voluntary undertaking, even though such relationships may help establish
the foreseeability of the injury. *Id.*; see also *Marshall*, 222 Ill. 2d at 436-37 (emphasizing the
four factors that give rise to a duty and the policy considerations inherent in those factors).
While we do not believe that a finding of a voluntary undertaking is a necessary prerequisite
to the recognition of a franchisor's duty, we determine whether Imo's voluntarily assumed a
duty.

¶ 60        Under the voluntary undertaking doctrine of liability, " '[o]ne who voluntarily undertakes
to render services to another is liable for bodily harm caused by his failure to perform such
services with due care or with such competence and skill as he possesses.' " *Decker v.
Domino's Pizza, Inc.*, 268 Ill. App. 3d 521, 526 (1994) (quoting *Siklas v. Ecker Center for
Mental Health, Inc.*, 248 Ill. App. 3d 124, 131 (1993)). A defendant is subject to liability if

- 12 -

the defendant voluntarily undertakes a duty and performs that duty negligently and the negligence is the proximate cause of the injury to plaintiff. *Phillips v. Chicago Housing Authority*, 89 Ill. 2d 122, 126 (1982). Where a duty of care is imposed, it is limited to the extent of the undertaking. *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992).

¶ 61    Illinois courts have adopted section 324A of the Restatement (Second) of Torts, "Liability to Third Person for Negligent Performance of Undertaking," which provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 62    Imo's maintains that any imposition of liability based on a voluntary undertaking should be based on misfeasance, not nonfeasance, and generally must involve an affirmative act. We have already determined Imo's actions were affirmative, particularly in regard to the drivers' requirements. Furthermore, our supreme court has held that a voluntarily assumed duty is not limited to misfeasance or reliance. *Phillips*, 89 Ill. 2d at 127-28. "The failure to properly complete or to carry out an assumed duty imposes liability in the same manner as for dangers affirmatively created during the course of the assumed undertaking." *Martin v. McDonald's Corp.*, 213 Ill. App. 3d 487, 491 (1991) (citing *Phillips*, 89 Ill. 2d at 127-29).

¶ 63    Imo's next contends that Bethalto retained total control over all the day-to-day operations of the franchise and therefore under the law it has not undertaken a duty to protect against the acts of its franchisee. In several cases cited by Imo's and plaintiff, courts have considered whether franchisors may be held liable for the criminal acts of third persons to employees and patrons of restaurants based on assuming a voluntary duty to protect the plaintiff. The issue of control is one of the determinative factors.

¶ 64    In *Castro*, discussed earlier, and *Chelkova v. Southland Corp.*, 331 Ill. App. 3d 716 (2002), two cases decided by summary judgment, the courts held that the franchisors did not undertake voluntary duties to protect their franchisees' employees from criminal attacks. In both cases, the franchisors had made suggestions or recommendations regarding security, but did not mandate security measures be followed by the franchisees. *Chelkova*, 331 Ill. App. 3d at 724; *Castro*, 314 Ill. App. 3d at 551. Both courts found that all security decisions were left up to the franchisees' discretion and that the franchisees were permitted to run the businesses as they saw fit. *Chelkova*, 331 Ill. App. 3d at 724; *Castro*, 314 Ill. App. 3d at 552.

¶ 65    In contrast, in *Martin v. McDonald's* and *Decker v. Domino's Pizza*, two cases tried to verdict, the courts held that the franchisors did undertake voluntary duties to establish security policies to protect their franchisees' employees from criminal harm. *Decker*, 268 Ill. App. 3d at 527; *Martin*, 213 Ill. App. 3d at 493. In *Martin*, the court found that "McDonald's clearly established a security policy which unquestionably included a follow-up. Nevertheless, its key security people *** admittedly failed to follow up." *Martin*, 213 Ill. App. 3d at 493. In *Decker*, the court found that once Domino's Pizza undertook to establish a

security program whose goal was to deter robberies and protect employees from harm, it had a duty to act with reasonable care. Defendant could be found liable for the negligent performance of the duty it undertook. *Decker*, 268 Ill. App. 3d at 527.

¶ 66 In a more recent case, *Lawson v. Schmitt Boulder Hill, Inc.*, on appeal from a section 2-619 dismissal, the court reversed the dismissal, holding that the franchisor failed to meet its burden of showing that it owed no duty to its franchisee's employee who had been criminally attacked. *Lawson v. Schmitt Boulder Hill, Inc.*, 398 Ill. App. 3d 127, 134 (2010). The court discussed at some length *Castro*, *Chelkova*, *Martin*, and *Decker*, and in summary stated that these cases "illustrate that whether a franchisor maintains mandatory security procedures is a crucial factor in determining whether the franchisor has voluntarily undertaken a duty of care toward a franchisee's employees." *Id.* at 133. Taking the allegations of the complaint as true, the court further found that, unlike the defendants in *Castro* and *Chelkova*, McDonald's, the franchisor, had mandated compliance with security procedures. *Id.* The *Lawson* court commented on McDonald's affidavit, in which McDonald's averred that it lacked authority to control the day-to-day operations of the franchisee or to hire, discharge, or discipline the franchisee's employees. The court stated, "none of the pertinent cases suggest that such authority is a prerequisite to the recognition of a duty." *Id.* The court went on to state that other averments in the affidavit–such as claims that McDonald's does not supply any products to the franchisee and does not file a tax return for the franchisee–were even less relevant. The court emphasized that "[n]otably absent" from McDonald's affidavit were any averments discussing its policies regarding security at franchisee restaurants, the very factors that were found to be relevant in *Martin* and *Decker*. *Id.* at 133-34.

¶ 67 Apart from the fact that the instant case does not involve criminal conduct, we believe that our case is more similar to *Martin* and *Decker* than *Castro* and *Chelkova.* Here, the factors that are relevant to whether Imo's actions amounted to a voluntary undertaking are those having to do with its driver safety policies. The safety policies Imo's set for drivers were self-imposed standards that mandated compliance.

¶ 68 Critically here, Imo's required a good driving record. The manual provided that a "Good Driving Record" "*means the person does not have *** 3 or more moving citations and/or accidents in the most recent 3 years.*" (Emphasis in original.) The manual further provided: "*[A motor vehicle report (MVR)] must be checked before someone is hired <u>and at least every 6 months while an individual who is working for you has any driving responsibilities</u>. If a driver's MVR changes so that they no longer have a Good Driving Record, they must be prohibited from performing further driving for you.*" (Emphasis in original.) The franchisee was required to adhere to all standards that were italicized in the manual. The manual also required that each store "*must keep every MVR you obtain on an employee in that employee's file.*" (Emphasis in original.)

¶ 69 Importantly, the manual further reserved to Imo's the right to monitor the stores' adherence to the policies and force compliance. Imo's assumed a duty to protect third persons from accidents involving Imo's delivery drivers when it initiated a safe driving policy; required its stores to obtain, update, and retain MVRs; and then reserved the right to inspect for and enforce compliance. Yet, Imo's did nothing to monitor or enforce its own safety policy.

¶ 70 Imo's also contends that the voluntary undertaking doctrine should be narrowly construed and confined to the contractual obligation. Defendant cites the rule of law that the duty of

- 14 -

care is limited to the extent of the undertaking. *Castro*, 314 Ill. App. 3d at 547; *Decker*, 268 Ill. App. 3d at 526. Here, the scope of the undertaking is defined by the standards that Imo's set out in its agreement, manual, and driver contract mandating certain requirements be met. See *Decker*, 268 Ill. App. 3d at 526. The fact that Imo's undertook to monitor Lyerla's driving record and failed to do so is within the scope of its assumed duty. See *Coty v. U.S. Slicing Machine Co.*, 58 Ill. App. 3d 237, 242 (1978).

¶ 71    In *Martin*, the defendant franchisor urged the court to consider the separate and distinct nature of the corporate relationship with its licensee. The court stated, "No matter what legal relationships existed, it was McDonald's Corporation which undertook to provide security and protection to plaintiffs." *Martin*, 213 Ill. App. 3d at 491. Restatement (Second) of Torts section 324A comment b states, "This Section applies to any undertaking to render services to another, where the actor's negligent conduct in the manner of performance of his undertaking, or his failure to exercise reasonable care to complete it, or to protect the third person when he discontinues it, results in physical harm to the third person or his things." Restatement (Second) of Torts § 324A cmt. b (1965). Comment c states, "Clause (b) finds common application in cases of the negligent performance of their duties by employees or independent contractors, which creates or increases a risk of harm to third persons." Restatement (Second) of Torts § 324A cmt. c (1965). Thus, any concurrent negligence of Bethalto or Lylera does not absolve Imo's of its duty once undertaken.

¶ 72    Regardless of whether Imo's had an affirmative duty to protect plaintiff from the negligent acts of third persons, Imo's voluntarily undertook a duty when it set a mandatory safety policy for driver's qualifications and then failed to monitor Bethalto for compliance with its own policy.

¶ 73                              c. Breach and Proximate Cause

¶ 74    Imo's contends that even if it owed plaintiff a duty, he has not proven a breach of that duty or that the breach was the proximate cause of his injuries. In order to constitute proximate cause, "[t]he injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from his act." *Neering v. Illinois Central R.R. Co.*, 383 Ill. 366, 380 (1943). "Questions concerning breach of a duty and proximate cause are factual matters for the jury to decide. [Citations.] A jury's determination will not be set aside unless, clearly, it is not supported by the evidence." *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 454 (1992).

¶ 75    When all the evidence is considered along with all reasonable inferences in the light most favorable to plaintiff, it was not unreasonable for the jury to conclude that Imo's was negligent by virtue of its various operating policies and procedures that put speed of delivery ahead of safe driving in delivering pizzas; that Imo's negligence played a substantial part in Lyerla's admittedly negligent driving; and that the resulting accident and injury to plaintiff was a reasonably probable consequence of Imo's conduct. In addition, it was not unreasonable for the jury to conclude that Imo's had failed in its assumed duty to monitor the driving record of Lyerla to ensure that he was in compliance with Imo's requirement that no driver have three or more moving violations and deliver pizzas; that Imo's failure to monitor allowed Lyerla to deliver pizzas when he was in violation of Imo's own mandatory policy;

and that the resulting accident and injury to plaintiff was a reasonably probable consequence of Imo's conduct.

¶ 76                    2. Vicarious Liability and Agency Relationship

¶ 77        Imo's contends that plaintiff failed to prove that it was liable for the actions of Bethalto Pizza and its driver Lyerla under a theory of *respondeat superior* because the evidence did not support the jury's finding that a principal-agent relationship existed between Imo's and Bethalto. Imo's maintains that the agreement and manual expressly stated Bethalto was an independent contractor and the evidence showed that Bethalto retained total control over its day-to-day operations.

¶ 78        "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958).

¶ 79        The principal-agent relationship is an exception to the general rule that a person injured by the negligence of another must seek his remedy from the one who caused the injury. *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1057 (2011). Under traditional *respondeat superior* analysis, a principal can be found vicariously liable for the torts of his agent committed within the scope of the agency or employment. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 231 (2000); *Wright v. City of Danville*, 174 Ill. 2d 391, 405 (1996). A principal is generally not responsible for the conduct of an independent contractor. *Sperl*, 408 Ill. App. 3d at 1057. "An independent contractor has been repeatedly defined as one who renders service in the course of the occupation, and represents the will of the person for whom the work is done only with respect to the result, and not the means by which it is accomplished." *Dean v. Ketter*, 328 Ill. App. 206, 211 (1946).

¶ 80        A written contract is not conclusive of the nature of the relationship between the parties. Despite an agreement labeling the relationship as that of an independent contractor, the facts of the case can demonstrate an agency status. *Sperl*, 408 Ill. App. 3d at 1057. The nature of the relationship depends on the actual practice between the parties and, as a general rule, is a mixed question of law and fact to be submitted to the jury. *Davila v. Yellow Cab Co.*, 333 Ill. App. 3d 592, 595-96 (2002) (citing *Tansey v. Robinson*, 24 Ill. App. 2d 227, 234 (1960)). "In determining whether a person is an agent or an independent contractor, the court's cardinal consideration is the right to control the manner of work performance, regardless of whether that right was actually exercised." *Sperl*, 408 Ill. App. 3d at 1057; see also Illinois Pattern Jury Instructions, Civil, No. 50.05 (1995).

¶ 81        Determination of whether a relationship of employer and employee, principal and agent, or owner and independent contractor exists depends upon such facts as the manner of hiring, the right to discharge, the manner and direction of servants, the right to terminate the relationship, and the character of the supervision of the work done. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 44.

¶ 82        Additionally, liability can arise from negligence in training or supervising under both an agency and direct negligence theory. See *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 27 (citing Restatement (Second) of Agency § 213(a) (1958), and Restatement (Third) of Agency § 7.05(1) (2006)).

¶ 83    Restatement (Third) of Agency section 7.05(1) states, "A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent." Restatement (Third) of Agency § 7.05(1) (2006). Comment b states, "The rules stated in this section stem from general doctrines of tort law not limited in their applicability to relationships of agency as defined in § 1.01." Restatement (Third) of Agency § 7.05 cmt. b (2006). Comment b further provides, "It is not a defense to liability under this rule that the actor whose conduct harms a third party does not have a relationship of agency as defined in § 1.01 with the person who conducted an activity through the actor." Restatement (Third) of Agency § 7.05 cmt. b (2006). The reporter's notes state that this section is the counterpart to Restatement (Second) of Agency section 213. "The formulation in this section, as in § 213, is not limited to situations in which an actor is characterized as the agent or employee of the person who conducts an activity through the actor." Restatement (Third) of Agency § 7.05, Reporter's Notes (2006).

¶ 84    After a careful review of the record, we find that the agreement, the confidential operating manual, and the driver contract provided ample evidence along with trial testimony that Imo's had the right to control many aspects of Bethalto's daily operations. These documents allowed Imo's to control employment decisions, training, safety, daily maintenance, wage and hour requirements, record-keeping, supervision and discipline of employees, and hiring and firing, as well as the right to terminate the franchise relationship with Bethalto. The agreement required the franchisee "to operate the Store and provide delivery service *** in accordance with the operational standards as may be established by Franchisor from time to time." While Imo's characterizes many of these directives as suggestions or recommendations that were left up to the franchisee's discretion, the frequent use of terminology such as "must," "require," and "mandatory" belies that characterization. The manual expressly indicated that its numerous italicized provisions were mandatory. In addition, some of the provisions that were not italicized expressly mandated compliance. One such nonitalicized provision in the manual stated: "You must be open on New Year's Eve. We suggest you stay open until 2:00 a.m." The jury could have reasonably inferred that the use of compulsory language evidenced Imo's right to operational control and that provisions like "You must be open on New Year's Eve" were not mere suggestions or recommendations. Margaret Imo's testimony admitted that there were requirements in the manual that were not italicized.

¶ 85    The agreement required Bethalto to "conform with standards relating to signage, color scheme, appearance, hours of operation, cleanliness, sanitation, size of food item portions, menus, methods of preparation, employee uniforms, type of equipment and décor as designated by Franchisor."

¶ 86    There was evidence that Imo's control extended specifically to the pizza delivery drivers. Pizza delivery was required under the agreement. Imo's prescribed the minimum delivery area. Imo's required Bethalto to name Imo's Franchising, Inc., as an additional insured on all general liability and nonowned auto insurance policies. Imo's required the stores to pay a fee equal to 4% of their sales. The manual required Bethalto to adhere to guidelines in hiring, supervising, and terminating the drivers. The manual included eight pages of detailed requirements entitled "Hiring and Supervising Drivers." Imo's required that drivers "*have a*

*Good Driving Record as established by a motor vehicle report (MVR).*" (Emphasis in original.) The manual further provided:

> "*This means the MVR must be checked before someone is hired <u>and at least every 6 months while an individual who is working for you has any driving responsibilities</u>. If a driver's MVR changes so they no longer have a Good Driving Record, they must be prohibited from performing further driving for you*." (Emphasis in original.)

Bethalto was required to keep every MVR it obtained in the employee's file. A full page was devoted to what defined a good driving record. One requirement was that a driver have fewer than three moving violations in the preceding three years.

¶ 87    The manual contained an appendix A with forms. The following forms were mandatory as indicated: "Procedure for New Driver's MVR Report–This form is mandatory"; "Driver Eligibility Guidelines–These guidelines are mandatory"; "Driver Contract–This form is mandatory"; and "Safe Work Practices for Drivers–These practices are mandatory." The procedure for new driver's MVR report and driver eligibility guidelines contained numerous specific requirements for hiring. Imo's required that Bethalto calculate the hourly rate of drivers to ensure that they receive minimum wage; if they did not, Bethalto was required to make up the difference. The driver contract stated that a driver could be terminated for not "performing the work with safety and expedition."

¶ 88    Imo's reserved the right to enforce the standards to ensure compliance. The manual provided:

> "We have the right to make inspections and inquiries of your store during normal business hours without notice. If we find areas that need improvement, we have the right to make certain recommendations and suggestions to you, and in some cases, we may require you to make certain changes or improvements. You agree to make those changes and improvements that we may require of you."

Under the agreement, Imo's reserved the right to terminate the franchise if Bethalto did not perform the mandatory obligations under the confidential operating manual.

¶ 89    Imo's contends that Bethalto conducted business without interference from Imo's in its operations or procedures. Assuming this to be true, it is not determinative of the agency status. It is the *right* to control rather than the *fact* of control that is determinative of agency. See *Sperl*, 408 Ill. App. 3d at 1057. Likewise, the fact that the agreement expressly stated that Bethalto was an independent contractor is also not determinative of the relationship. See *id.*

¶ 90    Applying these rules of law and factors to this case, we find that the evidence adduced at trial was sufficient to support the jury's finding on agency. The existence of an agency relationship was genuinely disputed and properly a question to be decided by the jury and not prior to trial. We also note that neither scope of agency nor apparent agency was at issue. In considering all the evidence, along with reasonable inferences in the light most favorable to the plaintiff, we cannot say that there was a total lack of evidence to support the jury's determination that Bethalto was the agent of Imo's. Further, we find that the jury's determination of agency was not against the manifest weight of the evidence.

¶ 91    For these reasons we find that the trial court did not err in denying Imo's motion to dismiss plaintiff's amended complaint, its motion for summary judgment, and its motions for directed verdict.

## C. Denial of the Motion for Remittitur or a
New Trial on the Issue of Damages

¶ 93    Defendants next argue that the trial court erred in denying their request for remittitur or in the alternative a new trial on damages for future medical expenses and future lost earnings. They argue that the jury's award of $657,000.68 for past and future medical expenses and $607,500 for past and future lost earnings is against the manifest weight of the evidence.

¶ 94    The standard of review for a trial court's ruling on a motion for new trial on the issue of compensatory damages is whether the verdict is against the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992); *Blackburn v. Illinois Central R.R. Co.*, 379 Ill. App. 3d 426, 430 (2008). "A verdict is against the manifest weight when it is arbitrary, unreasonable, or not based upon any evidence." *Hollowell v. Wilder Corp. of Delaware*, 318 Ill. App. 3d 984, 990 (2001) (citing *Maple*, 151 Ill. 2d at 454). When determining whether a verdict is against the manifest weight of the evidence, the appellate court should only consider the evidence in the light most favorable to the party who prevailed at trial. *Wallace v. Radovick*, 55 Ill. App. 2d 264, 266 (1965). The standard of review for a trial court's ruling on remittitur is abuse of discretion. *Hollowell*, 318 Ill. App. 3d at 991.

¶ 95                            1. Future Medical Expenses

¶ 96    We cannot say that the award for future medical expenses was against the manifest weight of the evidence or that the trial court abused its discretion in denying the motion for remittitur or new trial on damages. Plaintiff suffered a severe traumatic brain injury (TBI) as a result of the collision. At the time of trial, plaintiff's related past medical expenses totaled $196,315.68.

¶ 97    The jury heard testimony from three board-certified surgeons from Barnes-Jewish Hospital regarding three surgeries they performed on plaintiff in the days following the collision. Plaintiff was hospitalized at Barnes-Jewish for over two weeks and then transferred to a rehabilitation facility for approximately another two-week period before being released to outpatient therapy.

¶ 98    The jury also heard from Dr. Sindhu Jacob, a rehabilitation specialist who is board certified in physical medicine. Dr. Jacob works with brain injury patients. She provided inpatient physical therapy, occupational therapy, and speech therapy to plaintiff following the accident. Dr. Jacob testified that plaintiff sustained skull fractures and suffered from a seizure disorder, migraine headaches, deficits in attention, and memory impairment symptoms, all of which were caused by the accident. She last saw plaintiff two weeks before trial, in November 2011. She reported that he had been hospitalized at Alton Memorial Hospital for a grand mal seizure in February of 2011. Dr. Jacob testified that the seizure disorder and migraine headaches were ongoing complications from the head injury. She had prescribed two antiseizure medications and a migraine prevention medication. She explained that if plaintiff had additional seizures, he could require antiseizure medication for life. She stated that a brain injury increases the risk of developing further seizures even if one had seizures before.

¶ 99    Dr. Jacob also testified that plaintiff was still experiencing developmental complications after his brain injuries and that he was at risk for future complications, including headaches,

- 19 -

seizure disorders, behavioral problems, attention deficits, memory issues, cognitive deficits, endocrine disorders, and hydrocephalus–an increase in the pressure or build-up of the fluid in the ventricle system of the brain, which can cause confusion, lethargy, sleepiness, and trouble with bladder control.

¶ 100     Dr. Fucetola, a neuropsychologist who first treated plaintiff in September 2009 during his rehabilitation, also testified on plaintiff's behalf. He characterized plaintiff's brain injury as severe because testing done one hour postinjury scored plaintiff's brain injury in the severe traumatic brain injury range and because a CT scan showed structural brain damage. He testified that a six-millimeter midline shift of the plaintiff's brain due to the subdural hematoma was "actually quite grave in terms of the brain." Dr. Fucetola explained that because the brunt of the brain injury was to the left side, which controls language and verbal abilities, difficulty with verbal memory and language would be normal. He further testified that once a patient suffers a seizure after a severe TBI like plaintiff did, the patient is at high risk for other seizures.

¶ 101     Dr. Fucetola testified that when he last saw plaintiff in August of 2011, plaintiff essentially had the same issues he had when he saw him in August 2010. Dr. Fucetola testified that plaintiff's condition was permanent and that he was in the plateau phase where he would not expect further recovery. He testified that plaintiff's defects included short-term memory, verbal fluency, and mental speed. He noted that plaintiff's mental speed defect was probably aggravated by the seizures caused by the TBI and the antiseizure medication. Plaintiff's symptom validity tests showed that plaintiff put forth his best effort. Dr. Fucetola testified that there were no treatments that could restore plaintiff's functioning, but he could benefit from using pagers or devices that help keep him reminded of things.

¶ 102     Dr. Raymond Cohen, a board-certified neurologist who examined plaintiff and his medical records, testified on behalf of plaintiff that as a result of the accident, plaintiff suffered a moderate traumatic brain injury, which required him to undergo a craniotomy for a depressed skull fracture, including fixation with a plate and screws. In addition, plaintiff suffered extensive skull fractures, including temporal bones, and left orbit of the brain injury, a left frontal lobe contusion, and a small left-sided subdural hematoma with midline shift of the brain six millimeters. Dr. Cohen further testified that plaintiff suffered a bilateral pulmonary contusion requiring bilateral chest tubes, underwent surgery for a cricothyrotomy with subsequent revision tracheostomy or tracheotomy, sustained a larynx fracture requiring repair, and experienced posttraumatic seizures. The seizures appeared to have stabilized by the time Dr. Cohen examined plaintiff. Dr. Cohen saw plaintiff seven months after the accident but before he had his more recent seizure in February 2011. Dr. Cohen testified that plaintiff also suffered from posttraumatic sleep disorder, keloid scarring, intractable itching of the neck, and cervical and lumbar strain/sprain. Dr. Cohen testified that it was extremely unlikely that plaintiff would have a full recovery.

¶ 103     Dr. Zipfel, who performed plaintiff's craniotomy, testified that as a result of the craniotomy, plaintiff is restricted from contact sports that might lead to a direct blow and that he is at risk for reinjuring the area from motor vehicle accidents or falls. He is also at risk for increased seizure activity over time.

¶ 104     Multiple witnesses testified that plaintiff cannot live on his own and needs a caretaker to protect himself and anyone else living with him from accidents. There was testimony that plaintiff's memory deficit was severe enough to create hazards. For example, plaintiff forgets

food on the stove and in the oven and forgets to take his medication. Plaintiff's father had arranged for someone to live with plaintiff and help care for him in exchange for free housing. However, that person has no training and is not a licensed caregiver. The testimony characterized the situation as a somewhat temporary arrangement.

¶ 105     Defendants' argument that the future award was excessive rests upon a contention that there was no evidence that plaintiff needed future medical care. We first note that defendants acknowledge that plaintiff incurred $196,315.68 in medical expenses at the time of trial, which they concede was properly included in the damage award. Defendants assert that plaintiff's future medical expenses should be limited to the cost of $140 per month for his medication. According to defendants, the evidence supported a verdict of no more than $24,371.02 for future medical expenses. Defendants arrive at this amount by multiplying $140 per month over a life span of 51 years and reducing that sum to present cash value.

¶ 106     " 'The determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court.' " *Blackburn*, 379 Ill. App. 3d at 430 (quoting *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997)). Future damages by their nature are always subject to some uncertainties. Because of the finality of a verdict, courts allow the trier of fact a degree of latitude in awards for medical expenses shown by the evidence to likely arise in the future but that are not itemized by testimony. *Richardson*, 175 Ill. 2d at 112.

¶ 107     At the time of trial, plaintiff was in ongoing treatment for seizure disorder and debilitating headaches stemming from the brain injury. None of plaintiff's physicians believed that he would fully recover. His doctors agreed that his condition–which included severe short-term memory problems, decreased mental speed, and problems with concentration and verbal fluency–was permanent. Plaintiff's doctors testified regarding a number of complications and conditions that plaintiff was at risk for or could likely develop as time passed. There was also testimony that the jury could have believed regarding the need for an ongoing trained caretaker, particularly after plaintiff's parents were no longer able to assist with his care. We find that the medical testimony justified an inference that there would be future medical expenses. *Levin v. Welsh Brothers Motor Service, Inc.*, 164 Ill. App. 3d 640, 659 (1987); see also *Scheibel v. Groeteka*, 183 Ill. App. 3d 120, 138 (1989) (future medical expenses could reasonably be inferred given the evidence on the nature of the plaintiff's disability, despite lack of medical testimony on amount of expenses).

¶ 108     This court has also held that the absence of direct testimony as to a particular amount of damages is not sufficient reason alone to attack a jury verdict. *Rainey v. City of Salem*, 209 Ill. App. 3d 898, 907 (1991). "If the elements of damage presented for the jury's consideration are proper under the facts of the case, then the assessment of damages is preeminently for the jury, even though reasonable persons could differ as to the amount." *Id.*

¶ 109     We cannot say that this amount exceeds the range of fair and reasonable compensation; nor can we say that the verdict is based on passion or prejudice or is so large as to shock the judicial conscience. See *Blackburn*, 379 Ill. App. 3d at 433. Accordingly, we will not substitute our judgment for that of the jury. We find that the trial court did not err in allowing the amount of future medical damages to stand.

¶ 110                                    2. Future Lost Earnings

¶ 111        The jury awarded plaintiff $607,500 for past and future lost wages. Defendants argue that the future earnings award was based on speculative evidence and further that the jury did not follow the court's instructions on calculating future earnings. We cannot say that this award was against the manifest weight of the evidence or that the trial court abused its discretion in denying the motion for remittitur or a new trial on damages.

¶ 112        Defendants first contend that the jury did not reduce future earnings to present cash value as instructed by the court. This contention is based on their argument that there was no evidence to support a finding that the plaintiff would have earned more than $12,000 per year over his life expectancy of 51 years. Based on this assumption, defendants calculate a present value of future lost earnings of between $135,507 and $222,921.

¶ 113        The jury's present cash value calculations are not part of the record. Because we do not know the amount of future lost wages the jury awarded to plaintiff before reducing that sum to present cash value, there is no way to determine whether the jury's calculation was incorrect. Defendants concede that a salary of $50,000 to $60,000 per year would yield a present cash value of $607,000, but they argue that such an award is not supported by the evidence.

¶ 114        " 'Where the right of recovery exists the defendant cannot escape liability because the damages are difficult of exact ascertainment. *** The rule is, that while the law will not permit witnesses to speculate or conjecture as to possible or probable damages, still the best evidence which the subject will admit is receivable, and this evidence is often nothing better than the opinions of persons well informed upon the subject under investigation.' " *Levin v. Welsh Brothers Motor Service, Inc.*, 164 Ill. App. 3d 640, 655 (1987) (quoting *Johnston v. City of Galva*, 316 Ill. 598, 603-04 (1925)).

¶ 115        Defendants cite to *Christou v. Arlington Park-Washington Park Race Tracks Corp.*, 104 Ill. App. 3d 257 (1982), for the proposition that it is reversible error to allow testimony that is too speculative to be competent evidence of lost earnings. *Id.* at 260. The plaintiff in *Christou* was unemployed at the time of injury but training to become a bartender and had hopes to one day own a restaurant. The trial court allowed in testimony related to what a restaurant owner would earn. The court reversed, holding that plaintiff's mere ambition to own a restaurant was too remote and speculative to be the basis for lost earnings damages. *Id.*

¶ 116        Similarly, in *Carlson v. City Construction Co.*, 239 Ill. App. 3d 211 (1992), the trial court allowed damage testimony that decedent plaintiff had an ambition to become an engineer. The court found the testimony impermissible because there were too many speculative contingencies. The court noted that although plaintiff had obtained his GED, he had not yet attended, been accepted, or even applied to a college, all prerequisites to becoming an engineer. *Id.* at 231-32. Defendants also cite *Morris v. Milby* for the proposition that admissible damage evidence must be based on an attainable goal. *Morris v. Milby*, 301 Ill. App. 3d 224, 229 (1998).

¶ 117        Here, the jury heard testimony from several witnesses regarding plaintiff's wage loss damages. The jury heard from plaintiff's father that plaintiff had worked for him in the past in a position similar to a millwright. Plaintiff's father was an automation engineer whose business was building conveyor systems for bottling works. He testified that he is familiar with the work of millwrights because he runs construction crews with millwrights in factory

settings. Plaintiff had worked with him in these settings. In his opinion, plaintiff had the qualifications and the ability to be a millwright and had done comparable work.

¶ 118    In addition, the jury heard testimony that at the time of the accident, plaintiff had been working for several months as a salesman for defendant Metro East selling Kirby Vacuums. The jury heard from a coworker that plaintiff was one of Kirby's top salesmen. The coworker testified that employees were told that they could earn up to six figures selling vacuums.

¶ 119    Defendants argue that plaintiff's vocational expert, Stephen Dolan, was impermissibly allowed to testify to what plaintiff could have earned as an electrical engineer or a millwright. We believe it was unlikely that plaintiff would have become an engineer. He had not completed his GED at the time of the accident and had a poor academic record in high school. In applying the foregoing cases, we agree that it would have been error for the jury to consider damages based on plaintiff's becoming an engineer. However, this argument mischaracterizes the record. Although there was a passing reference to plaintiff's interest in becoming an engineer, the jury did not hear any testimony regarding his potential earnings as an engineer.

¶ 120    Moreover, plaintiff's counsel did not mention or elicit any testimony regarding engineering on direct examination of Dolan. It was defense counsel who brought the issue before the jury on cross-examination by asking Dolan if plaintiff had told him that he had wanted to be an engineer when he interviewed him, to which Dolan responded that plaintiff did tell him that. However, Dolan did *not* testify to what plaintiff could have earned as an engineer, or even if he thought it was likely that plaintiff could have become an engineer.

¶ 121    Dolan reviewed plaintiff's medical records and high school transcripts, spoke with family members, and interviewed and tested plaintiff. Dolan testified that plaintiff had a life expectancy of 51 years. It was his opinion that after the accident, plaintiff was not capable of holding down a full-time job, and he was pessimistic about part-time employment. Dolan testified that plaintiff had been doing the equivalent of a millwright's job when he worked for his father. Dolan characterized plaintiff's work as training to assemble and fabricate production machinery, which is what a millwright does. He testified that according to the United States Department of Labor, the average salary for a millwright was approximately $50,000.

¶ 122    Dolan also gave the opinion that a salesman job, such as the one plaintiff held selling Kirby Vacuums at the time of his accident, had been suitable for plaintiff and did not require a high school degree. Dolan stated that even without a high school degree, salespeople can make a great deal of money. Dolan was asked to address evidence that plaintiff had a sporadic work history prior to working with his father or for Metro East. Dolan testified that this was typical for someone in his teens and early twenties and did not change his opinion. Dolan testified that if plaintiff had not pursued a sales or a millwright job, at a minimum, he would have had preinjury earnings of approximately $15,000 per year.

¶ 123    Unlike the cases cited by defendants, the estimates of plaintiff's earning capacity preinjury were not too remote or speculative. These estimates did not assume he would be working in a new profession or need to obtain additional education. Both the sales and millwright careers were ones that plaintiff had already demonstrated aptitude in. As such, they were attainable goals. We believe that plaintiff's evidence was sufficient to support the jury's award. Accordingly, we find the trial court did not err in allowing the amount of lost

wage damage award to stand.

¶ 124          D. Additional Allegations of Errors Requiring a New Trial

¶ 125    Imo's and Bethalto next contend several additional errors warranted a new trial. We consider each claimed error in turn.

¶ 126    Defendants argue that the court erred in not granting a mistrial after interjecting itself into the examination of two of defendants' witnesses and voicing its opinion regarding the evidence and the competency of counsel.

¶ 127    "Wide latitude must be allowed a trial judge in conducting a trial, and only where his conduct or remarks are of the sort that would ordinarily create prejudice in the minds of the jurors is reversible error present." *Vinke v. Artim Transportation System, Inc.*, 87 Ill. App. 3d 400, 412 (1980). The court is permitted to question a witness to clarify and elicit the truth, if done in a fair and impartial manner. *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 651-52 (2007). " 'The propriety of judicial examination of a witness is determined by the circumstances in each case and rests largely in the discretion of the trial court.' " *Comito v. Police Board*, 317 Ill. App. 3d 677, 687 (2000) (quoting *People v. Brown*, 200 Ill. App. 3d 566, 576 (1990)).

¶ 128    The first interchange that defendants take issue with occurred during defense counsel's questioning of Mrs. Wilson, one of the owners of Bethalto Pizza. After a somewhat lengthy exam of Mrs. Wilson regarding the relationship between Imo's and Bethalto, Mrs. Wilson testified that there was no involvement by Imo's in the operation of her store. At this point, the court stated, "You really just rented the Imo's name, have you not?" The remaining interchange between the judge and the witness and counsel evinced the court's growing frustration with the repetition and the pace of the questioning. At one point, the court stated: "Come on. Let's get to the meat of this case." Imo's counsel responded, "I'll move on." Later, the court stated: "And it's getting to the point where this trial–I do have a responsibility as a judge to keep this case going. There's been a lot of wasted time, and there's been a lot of denying. Let's get to the point. Go ahead." Counsel asked the witness several more questions and then announced, "That's all the questions I have." At this point, the judge stated, "You're lucky."

¶ 129    The second interchange defendants complain of occurred during defense counsel's questioning of psychologist Dr. Oliveri, a defense expert. Defendants take issue with the following:

"THE COURT: What is your final upshot? What is your final question?

MR. CRANEY: My final question.

THE COURT: Why is he here?

MR. CRANEY: The final question are [*sic*] going to be are all of the–did he on his tests to show unreliable reporting. *** Judge, I am trying to hurry.

THE COURT: I still want to know what he's on the stand for. What is he here to say?

MR. CRANEY: I think he's just given his primary opinions.

THE COURT: I don't know if he–do you have a solid opinion on this?

THE WITNESS: Yes.

- 24 -

THE COURT: Which is what?"

¶ 130    In *Vinke v. Artim Transportation System, Inc.*, the appellate court rejected the contention of error regarding the judge's recap of repetitious and immaterial testimony, which concluded with the judge's statement, " 'so let's go on to something else.' " *Vinke*, 87 Ill. App. 3d at 412. Similarly, in *Mattice v. Goodman*, the appellate court found no error in the judge's comment during an examination of a witness that the testimony was " 'tiring.' " *Mattice v. Goodman*, 173 Ill. App. 3d 236, 244 (1988). The appeals court noted that the comment described the presentation of the testimony rather than its meaning. *Id.* Likewise, in *Foerster v. Illinois Bell Telephone Co.*, the appeals court rejected the contention of error in the judge's characterization of a witness's testimony as " 'loose.' " *Foerster v. Illinois Bell Telephone Co.*, 20 Ill. App. 3d 656, 663 (1974).

¶ 131    By contrast, in *Pavilon v. Kaferly*, a case cited by defendants, the judge misconstrued testimony and made numerous statements reflecting a bias against the plaintiff. *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 250-56 (1990). The judge stated that the plaintiff had attempted to rape the defendant when such was not the case. *Id.* at 255-56. The judge also made frequent *sua sponte* objections to the *pro se* plaintiff's questions of witnesses and numerous disparaging remarks about the plaintiff. For example, the judge stated that plaintiff was trying to fool the court and jury; plaintiff was trying to sneak things in; plaintiff's apologies were insincere; and plaintiff gave the judge nothing but problems since the trial started. *Id.* at 251-53. Further, the judge conveyed an opinion regarding the credibility of a witness, telling that witness: " 'We know where your sentiments lie. *** I don't care to have you add things that are not asked of you because you think they may help your friend.' " *Id.* at 256. The appellate court found that the cumulative effect of the conduct and remarks of the judge prejudiced plaintiff and required reversal. *Id.*

¶ 132    Likewise, in *Holton v. Memorial Hospital*, the supreme court found a new trial warranted when the judge admonished the jury that one of defendant's witnesses gave inaccurate testimony on a collateral issue and was led to do so by defendant's attorneys and plaintiff's counsel made repeated claims of defendant's fraudulent misconduct. *Holton v. Memorial Hospital*, 176 Ill. 2d 95 (1997). There, the court found that these errors had a strong probability of prejudicing the jury. *Id.* at 120.

¶ 133    We believe that the court's conduct in both interchanges in this case was more similar to that in *Vinke*, *Mattice*, and *Foerster*, rather than *Pavilon* and *Holton*. In the context of a lengthy trial, the judge's remarks were not excessive and of the nature that would ordinarily cause prejudice. The record on appeal does not indicate an angry, sarcastic, or demeaning tone.

¶ 134    While it may have been preferable if the judge had not made the remarks "You really just rented the Imo's name" and "You're lucky," both could have just as easily been said in jest and are ambiguous in meaning. The remarks could also be viewed as a summation of Mrs. Wilson's testimony and position that Imo's had little to no control over the operation of Bethalto's franchise operation. Even defendants hesitate to go so far as to say that the judge's comments were a deliberate attempt to show advocacy, as Imo's characterizes the effect of the court's behavior as "inadvertent."

¶ 135    It is important to view the interactions in the context of the witnesses' entire testimony. Just prior to the challenged interchange involving Dr. Oliveri, he had been testifying at length regarding the validity of the results of a battery of psychological tests given by plaintiff's

treating psychologist, Dr. Fucetola, and comparing those with the results of testing he conducted. Following the conclusion of this testimony, plaintiff's counsel asked: "I guess I just want to make sure I understand what you've told us after an hour plus of this. Based on your testing, Matt may or may not have a brain injury that has permanent impairment?" Dr. Oliveri replied: "Based on my testing, his current presentation, the current test results and his current behavior can't all be attributed to the residual after effect of brain dysfunction. If he's got brain dysfunction, it's at the mild end of the continuum." Plaintiff's counsel then asked: "So we are not talking about the same thing, I don't think. Didn't you just tell the jury that after all of your testing that there were enough invalid results that you can't say for sure whether or not he has any permanent impairment?" The witness responded, "That's correct."

¶ 136    In the context of Dr. Oliveri's lengthy and layered testimony, it was within the court's discretion to request defense counsel to move testimony along and clarify testimony that was obscure. In addition, we do not believe that the court's remarks disparaged counsel or precluded him in any way from developing his line of questioning. Following the interchange at issue, Dr. Oliveri continued testifying to his opinions to conclusion.

¶ 137    Likewise, we find no merit in Imo's argument that the court shifted the burden of proof as there was adequate evidence to support direct negligence and *respondeat superior* theories.

¶ 138    Finally, we note that the jury was instructed as follows:

"It is your duty to resolve this case by determining the facts based on the evidence and following the law given you in the instructions. Your verdict must not be based upon speculation, prejudice or sympathy. My rulings, remarks or instructions do not indicate any opinion as to the facts."

We believe that this admonition to the jury was adequate to remove any prejudicial impressions.

¶ 139    We next consider Imo's contention that the court erred in allowing inquiry regarding the insurance and indemnity agreement between Bethalto and Imo's. "The admission of evidence is within the sound discretion of the trial court and a reviewing court will not reverse the trial court unless that discretion was clearly abused." *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003).

¶ 140    Citing to *Oliveira-Brooks v. Re/Max*, Imo's argues that evidence of insurance may be relevant in connection with an agency issue, but only if other evidence exists of a right to control. *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 136 (2007). Imo's position is that there was no other evidence to establish an agency relationship. Plaintiff responds that Imo's forfeited this issue when plaintiff offered into evidence both the manual and the agreement without objection. Regardless of whether Imo's forfeited this issue, we find no error. Because we have already determined that there was additional evidence other than the existence of insurance to establish an agency relationship, we find that the court properly ruled on this issue. "While not admissible to show fault, the existence of insurance may be shown in connection with issues such as agency, ownership, control, bias, or prejudice of a witness." *Boettcher v. Fournie Farms, Inc.*, 243 Ill. App. 3d 940, 945 (1993).

¶ 141    Imo's also contends that the court erred in allowing inquiry regarding defendants' use of shared counsel. This court does not reach the merits of this argument, as that contention has not been properly presented on appeal. There is no citation to any authority that supports

Imo's argument that referencing shared counsel was improper or prejudicial. Statements unsupported by argument or by citation of relevant authority need not be considered. *Holmstrom v. Kunis*, 221 Ill. App. 3d 317, 325 (1991); see also Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (providing that arguments must be supported by citations to authority and that arguments not properly presented in an appellant's brief are forfeited).

¶ 142 Next, we address both defendants' argument that it was error for the trial court to exclude evidence of plaintiff's drug and alcohol use. Defendants claim that plaintiff's drug and alcohol use was relevant to mitigation of damages and for impeachment purposes.

¶ 143 We agree with plaintiff that the trial court did not abuse its discretion in excluding evidence of plaintiff's use of alcohol or marijuana. We find that plaintiff's treatment for alcohol and marijuana abuse eight years prior to the accident would have had no probative value and could have had a prejudicial impact on the jury. *Fultz v. Peart*, 144 Ill. App. 3d 364, 378 (1986). Medical records related to the seizure plaintiff had on the day of the accident and the seizure he had in 2011, some 18 months after the accident, did not show any evidence of marijuana or alcohol use. No doctor testified that drug or alcohol use before or after the accident in fact impacted his recovery, only that it *might* or *could* impact a patient's recovery. After listening to argument and defendants' offer of proof, and considering the matter overnight, the trial judge stated:

> "I'm trying to avoid a trial within a trial. From his injuries, I mean, severe injuries, this is not consequential in my opinion. I've been reading cases from early this morning, and I believe to allow it in, the prejudicial effect would overcome any reasonable inferences. And I think it would be too prejudicial. The cases seem to say that, and I'm not going to allow it in."

¶ 144 The trial judge gave the ruling careful consideration. There is substantial case law to support limiting references to alcohol or other drugs due to the potential for prejudice far outweighing any probative value. See *Bielaga v. Mozdzeniak*, 328 Ill. App. 3d 291, 296 (2002) ("Evidence of drinking is so prejudicial that more than mere drinking must be shown; actual intoxication with impairment of physical or mental capabilities is required."); *Roberts v. Norfolk & Western Ry. Co.*, 229 Ill. App. 3d 706, 716-17 (1992) (court affirmed exclusion of evidence of alcohol and marijuana treatment, where there was no evidence that plaintiff was using either at the time of the accident); *Fultz*, 144 Ill. App. 3d at 378 (evidence of plaintiff's alcohol consumption barred despite claim that it was relevant to life expectancy); *Reeves v. Brno, Inc.*, 138 Ill. App. 3d 861, 870 (1985) (error to permit references into evidence of plaintiff's marijuana use "because they were introduced to persuade the jury that drug abuse rather than plaintiff's head injury caused his mental deterioration").

¶ 145 Furthermore, defendants were permitted to ask plaintiff's treating doctor whether he believed "that the plaintiff after the accident took some steps that reasonably would be expected to have lowered his seizure threshold." Dr. Fucetola replied, "there are things he may have done that could have affected that threshold." Defense counsel also elicited the opinion that plaintiff disregarded his medical advice, which could have made it more likely that he would have seizures later on. Plaintiff admitted this during his own testimony.

¶ 146 Additionally, defendants were permitted an instruction on mitigation of damages. The jury was instructed that it could find "the plaintiff failed to mitigate[d] [*sic*] his alleged damages by taking actions that reasonably increased the risk of a seizure and delayed his recovery, against medical advice," and "the plaintiff failed to exercise ordinary care in

- 27 -

obtaining medical treatment." Moreover, the verdict form reveals that the jury awarded the plaintiff *zero* damages for "the increased risk of future seizures resulting from the injury." We find that there was no need to inject inflammatory evidence of drugs or alcohol into the case where the defendants effectively presented other evidence regarding this ultimate issue.

¶ 147    Next, defendants claim it was error for the trial court to allow plaintiff to testify that he was unable to pay for his medical care. Plaintiff states that this testimony was offered to rebut defendants' argument that plaintiff was refusing to take medication to treat his medical conditions. First we note that defendants did not provide any details about the testimony. When we reviewed defendants' citation to the record, we found that the testimony in question was not elicited by plaintiff, but rather *by defense counsel* on cross-examination of plaintiff's father. We set forth that testimony in full:

"Q. Okay. Now, there's been testimony in this case, again, I'm jumping ahead, that after the accident there was certain medicines that he couldn't afford to take, at least that's what the allegation is. Has he approached you after the accident and asked you and told you he didn't have the cash to pay for any drugs?

A. Well, he doesn't have any cash. You know, if Matt needed money for drugs he would have to ask me for it."

Defendants cannot now complain of error that they invited. *Oldenstedt v. Marshall Erdman & Associates, Inc.*, 381 Ill. App. 3d 1, 14 (2008).

¶ 148    Notwithstanding, we agree with plaintiff that this testimony was proper rebuttal. Plaintiff cites two cases precisely on point: *Vanoosting v. Sellars*, 2012 IL App (5th) 110365, ¶¶ 23-24 (reversible error not to allow relevant testimony on lack of health insurance to rebut defendant's claim that plaintiff did not seek treatment because condition had resolved); and *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412 (affirming admission of evidence that plaintiff stopped physical therapy because it was too costly in response to defendant's suggestion that she stopped because she did not need additional treatment). It is clear there is no error here.

¶ 149    Next, defendants claim it was error for the court to allow in a "Day in the Life" video of plaintiff. Defendants state that they objected to the video as being untimely produced and therefore it was improperly admitted, requiring a new trial. They cite to *Carlson v. General Motors Corp.*, 9 Ill. App. 3d 606 (1972), in support of their claim of error. In *Carlson*, the court held that the admission of a test involving complex engineering principles that was not timely disclosed in a faulty seat belt case against GM required a new trial. *Id.* at 620. The court set forth the factors the trial court should address when considering sanctions: surprise of the testimony to the opposing party, the prejudicial effect of the testimony, the diligence of the opposing party in seeking discovery, timely objection to the testimony, and the good faith of the party calling the witness. *Id.* at 619-20. Defendants have wholly failed to develop their argument in regard to these factors. Defendants offer no details of the discovery violation. They fail to state if they were prejudiced, and if so, how they were prejudiced by this video. Again, we have reviewed the record citations provided by defendants. While we note that defense counsel did place an objection on record, there are no specifics as to the basis for the objection. We are entitled to have cohesive arguments presented and not be burdened with argument and research. *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). Defendants have given us no basis to find an abuse of discretion in the trial court's decision to allow the video.

¶ 150    Bethalto also contends that a new trial is warranted because the cumulative effect of these errors deprived defendants of a fair trial. Because we have found no error, we need not consider this argument.

¶ 151                                   E. Jury Instructions

¶ 152    We next turn to jury instructions that the defendants contend were submitted in error. It is within the trial court's discretion to determine which instructions will be given, and its decision will not be disturbed absent an abuse of discretion. *Colella v. JMS Trucking Co. of Illinois, Inc.*, 403 Ill. App. 3d 82, 95 (2010) (citing *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002)). Abuse of discretion is dependent upon whether, taken as a whole, the instructions fairly, fully, and comprehensively inform the jury of the relevant legal principles. *Id.* (citing *Schultz*, 201 Ill. 2d at 273-74). If a party "fails to make a specific objection during the jury instruction conference," the party forfeits the right to challenge that instruction on appeal. *Id.* "Timely objection assists the trial court in correcting any problem and prohibits the challenging party from gaining an advantage by obtaining reversal based on the party's own failure to act." *Id.* "Furthermore, the doctrine of invited error prohibits a party from complaining of an error on appeal ' "which that party induced the court to make or to which that party consented." ' " *Id.* (quoting *Oldenstedt v. Marshall Erdman & Associates, Inc.*, 381 Ill. App. 3d 1, 14 (2008), quoting *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004)).

¶ 153    Imo's argues that the trial court erred in giving three of plaintiff's instructions over Imo's objection and refusing several of Imo's instructions. Imo's complains of plaintiff's instructions No. 5A, No. 6, and No. 7. In order to better understand both Imo's and plaintiff's arguments, we thoroughly reviewed the transcript of the jury instruction conference contained in the record.

¶ 154    We first turn to plaintiff's agency instruction No. 5A, based on Illinois Pattern Jury Instructions, Civil, No. 50.10 (2006) (hereinafter, IPI Civil (2006)). We need not discuss the specifics of this instruction because the record clearly supports plaintiff's claim that Imo's did not object to the instruction as given. When asked by the court if there was any objection, counsel stated, "No objection judge." Furthermore, the very modification that Imo's now complains of on appeal–that plaintiff left out the last three paragraphs of IPI Civil (2006) No. 50.10–was endorsed by Imo's counsel. Plaintiff had earlier submitted a version containing the three paragraphs at issue, but withdrew that one and submitted a revised instruction upon Imo's counsel's suggestion: "Hey judge, on this one, we submitted a similar instruction. We left out the last three paragraphs about independent contractor *** I think bringing in the independent contractor language kind of muddies up the issues because I really–I think the issue is just, you know, whether there is an agency relationship or not." Here, not only did Imo's fail to object to the instruction as given, but invited the error of which it now complains. Imo's is prohibited from complaining of an error which it both induced and consented to. See *Oldenstedt*, 381 Ill. App. 3d at 14; see also *McMahon v. Sankey*, 35 Ill. App. 341, 343 (1890). Imo's forfeited its right to complain of error.

¶ 155    Second, we turn to plaintiff's burden of proof instruction, No. 6, based on IPI Civil (2006) No. 21.02. When Imo's counsel was asked if he objected to instruction No. 6, he stated: "Yes. I think it's overly complicated for the jury." The court stated: "I don't think so. I'll give it over objection." There was no further statement made by Imo's counsel regarding

- 29 -

the nature of his objection to this instruction. Imo's now contends that the instruction was erroneous because it did not include the second element of its burden of proof on count VI–that plaintiff had to prove that he was injured, and that it did it not include a statement that plaintiff had to prove the existence of an agency relationship. We agree with plaintiff that Imo's failure to articulate in any way what "overly complicated" meant made the objection so vague as to be meaningless and did not preserve the claim of error for appeal. *Colella*, 403 Ill. App. 3d at 95. In order to preserve an objection to an instruction, the objection must be set forth with specificity so that the trial court knows the specific nature of the objection before ruling. *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 550 (1984). Imo's has forfeited its right to complain of error.

¶ 156 Third, we turn to plaintiff's issues instruction No. 7, based on IPI Civil (2006) No. 20.01. Imo's stated objection at trial, as it is on appeal, was that there was insufficient evidence adduced at trial regarding the existence of an agency relationship between Imo's and Bethalto to support the giving of this instruction. The trial court, in the exercise of its discretion, must instruct the jury on all issues it finds supported by the evidence. *Flynn v. Golden Grain Co.*, 269 Ill. App. 3d 871, 880 (1995). This court has already determined that there was sufficient evidence to support a jury's verdict based on an agency theory. We thus find that no error was committed in giving an instruction based on this theory.

¶ 157 Next, Bethalto and Imo's both argue that the trial court erred in giving several instructions to the jury related to certain elements of plaintiff's claim for damages, including Nos. 17, 18, 21, 22, 23, and 27. Defendants contend that these instructions were given over objection and not supported by sufficient evidence. We address each instruction in turn.

¶ 158 Instruction No. 17 was plaintiff's damage instruction, based on IPI Civil (2006) No. 30.01, "Measure of Damages," and further instructing on the various elements of damages. Defendants objected to inclusion of the phrase "aggravation of any pre-existing ailment or condition" in the main body of the measure of damage instruction. Defendants further objected to the inclusion of the following elements of damages: (1) disability experienced and reasonably certain to be experienced in the future (IPI Civil (2006) No. 30.04.01); (2) expenses for medical care, treatment, and services reasonably certain to be received in the future (IPI Civil (2006) No. 30.07); (3) the value of earnings lost and the present cash value of the earnings reasonably certain to be lost in the future (IPI Civil (2006) No. 30.07); and (4) increased risk of future seizures resulting from the injury (IPI Civil (2006) No. 30.04.03).

¶ 159 We have addressed in detail the sufficiency of evidence as to the factor of "aggravation of any pre-existing ailment or condition" and each of the above elements of damages in our earlier discussion of the defendants' motion for remittitur or a new trial on the issue of damages. We need not revisit this question. A party is entitled to instructions on any theory of the case that is supported by the evidence. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 549 (2008); *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). All that is required in giving an instruction is some evidence to justify the theory, and the evidence need not be substantial. *Dillon*, 199 Ill. 2d at 505; *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007). Suffice it to say that we find that plaintiff presented sufficient evidence on these issues to justify a corresponding jury instruction.

¶ 160 Instruction No. 18, based on IPI Civil (2006) No. 30.21, states: "You may not deny or limit the plaintiff's right to damages resulting from this occurrence because any injury

resulted from an aggravation of a preexisting condition or a preexisting condition which rendered the plaintiff more susceptible to injury." As we have already stated in discussing instruction No. 17 that there was sufficient evidence on the factor of a preexisting condition, we need not address this issue again.

¶ 161    Instruction No. 21 addresses future damages for plaintiff's injuries, medical, or caretaking expenses. The sufficiency of evidence on these damages has already been addressed in our discussion of instruction No. 17.

¶ 162    Instruction No. 22 addresses loss of plaintiff's future earnings damages. The sufficiency of evidence on these damages has already been addressed in our discussion of instruction No. 17.

¶ 163    Defendants next challenge plaintiff's instruction No. 23. We set out the totality of the jury instruction conference regarding that instruction:

> "THE COURT: We're now ready for 23.
>
> MR. CRANEY: I'm not sure there's been sufficient evidence in the case to talk about discount rates and present values, and I'm not sure that the foundation has been laid to give this kind of instruction.
>
> MR. DRIPPS: Well, are you withdrawing a claim that future earnings should be reduced to present value?
>
> MR. CRANEY: No.
>
> MR. DRIPPS: Because the instruction–I mean they need to be told how to do it.
>
> THE COURT: I'm going to give 23. It looks okay. Given over objection."

¶ 164    The defendants have complained of numerous errors in the submission of this instruction, but have not set out or stated what the instruction was. They complain that there was insufficient evidence adduced at trial regarding damages for future earnings, that it was a nonpattern instruction that did not correctly state the law, and that it should not have been given because there was a pattern instruction on point which should have been given instead. We are unable to decipher the points and arguments from the little information that we are given, which hinders our consideration of this issue. *Velocity Investments, LLC*, 397 Ill. App. 3d at 297.

¶ 165    We note, however, that Mr. Craney's only objection to the instruction at trial related to the sufficiency of the evidence to support an instruction on discount rates and present values. Defendants have forfeited the right to further complain by not making these additional objections at the jury instruction conference. See *Schultz*, 201 Ill. 2d at 273. We find no error, as we have already ruled on the sufficiency of the future earnings damages evidence. We further note as a point of interest that the very instruction defendants claim should have been given instead, IPI Civil (2006) No. 34.02, was in fact given by plaintiff, as pointed out in his citation to the record.

¶ 166    Finally, defendants complain of instruction No. 27, plaintiff's verdict form A, on the basis that it contained the same elements of damage in plaintiff's No. 17, which defendants claim were not supported by the evidence. As we have already determined that there was no error in plaintiff's No. 17, we find no error in plaintiff's No. 27 for the same reasons.

¶ 167    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 168    Affirmed.

¶ 169        JUSTICE SPOMER, dissenting.

¶ 170        I respectfully dissent. I see three major problems in this case. First, in my opinion, the record reflects that the defendants were deprived of the fundamental right to a fair trial despite the fact that the circuit court was made aware of collusion occurring during *voir dire* between the plaintiff and nominal defendants in the case whom the plaintiff planned to voluntarily dismiss from the case after the jury was selected. I do not believe the circuit court could in good conscience and in accordance with fundamental principles of justice condone such behavior nor should this court affirm a verdict rendered by a jury that was selected in such a manner. Second, I believe that Imo's was deprived of a fair trial when the circuit court questioned Bethalto's owner in a manner that indicated its bias on the issue of Imo's liability. Finally, I believe Illinois law provides no basis for a finding that Imo's, as franchisor, had a duty to protect the plaintiff from an accident caused by a driver employed by its franchisee. Accordingly, for the specific reasons that follow, I would vacate the judgment against Imo's and remand with directions that judgment be entered in its favor. Furthermore, I would reverse the judgment against Bethalto for want of a fair trial and remand for a new trial on damages, as Bethalto has admitted its vicarious liability for Lyerla's admitted negligence.

¶ 171                                         1. Conduct of *Voir Dire*

¶ 172        I believe it is important to set forth in detail the colloquy between the circuit court and counsel during *voir dire* so it is clear that the circuit court had specific information that would lead any reasonable judge to understand that collusion was occurring in jury selection between the plaintiff and nominal defendants who were voluntarily dismissed from the case by settlement the following day. The record clearly reflects that the plaintiff's counsel instructed counsel for Metro East Distributing to exercise one of its peremptory strikes on juror No. 9, and Metro East did so. Counsel for Greene and Yelton previously exercised their two strikes on two jurors that the plaintiff unsuccessfully moved to strike for cause. Counsel for Bethalto and Imo's stated on the record as follows:

> "Counsel for Metro East and Counsel for Jeremiah Green and Jason Yelton have met with Plaintiff's Counsel in the back room for some period of time before this started. Plaintiff's Counsel just instructed Counsel for Metro East as to how to exercise their strike. It's clear to me that what's happened is there's going to be a deal cut here where they are either going to be dismissed, even though one doesn't have insurance and probably shouldn't have been in the case to start with and one has tendered witness[1] before today, there's been some sort of deal struck where they are going to basically use their strikes for the plaintiff, which puts a distinct disadvantage on the Defense in this case. I'm moving for a mistrial. I've never seen any kind of gamesmanship like this. And that's my record."

---

[1]I believe that this is a transcription error and that counsel stated that "one has tendered limits before today," indicating that one of the nominal defendants had already tendered its policy limits before *voir dire* began.

¶ 173    The circuit court responded, "Okay. The motion is denied," and continued with the *voir dire*. Counsel for Bethalto and Imo's then stated, "Let the record reflect that I'm going to give time for[2] the plaintiff to continue to pass instructions to the other defendants." The court stated, "It's been done before," and continued with *voir dire*.

¶ 174    The next day, during the hearing on the joint motion for a good-faith finding of settlement, counsel for the defendants renewed their objections to the collusion during *voir dire* by stating as follows:

"I think it's all but been admitted here that there was an agreement that was entered into whereby the policy limits, which were tendered weeks ago, would be accepted after we had already started selecting a jury, in exchange for some sort of agreement whereby the Defense would throw their strikes the way of the plaintiff. *** This effectively made a situation where the remaining Defendants who will be in the case, ended up with four strikes, four peremptory strikes, and the Plaintiffs had at their disposal 12 peremptory strikes. That violates due process. I made a Motion for Mistrial, I am renewing our Motion for Mistrial. That can't be the purpose of the rule. Essentially the Plaintiffs were allowed to, at will, choose the jury they selected. *** This motion for Good Faith Finding basically says that the release is, the consideration is for collective payment of $20,000. Well, that's not in fact true. It appears to me that the consideration that is being paid here today was $20,000 plus an agreement to stay in the case long enough to throw the strikes, these additional four strikes, to the Plaintiff, to give them an unfair advantage in this case."

¶ 175    Following this colloquy, the circuit court indicated, "I'm not concerned about the strikes."

¶ 176    I cannot concur with the majority's finding of forfeiture under the egregious circumstances of this *voir dire*. Although the defendants, in hindsight, perhaps should have couched their objections to what was transpiring in the form of a request for a reallocation of the challenges, it is not surprising that it was difficult for counsel to discern the proper motion to make in the wake of, in my opinion, previously unheard of and mortifying conduct on the part of the plaintiff's counsel and the nominal defendants. It is clear from the record that the defendants brought to the circuit court's attention the fact that the nominal defendants were no longer on the "same side" as contemplated by section 2-1106 of the Code of Civil Procedure (735 ILCS 5/2-1106 (West 2010)) and that, accordingly, the allocation of the peremptory challenges among the defendants was no longer equal. In essence, the defendants who were left to try the case had 4 peremptory challenges, and the plaintiff had 12. I believe these circumstances distinguish this case from those cited by the majority for the proposition that the defendants must show that a biased or unqualified juror was empanelled. The issue at hand involves the equal apportionment of peremptory challenges between the plaintiff and the defendants, not whether a particular juror was objectionable. The record reflected a clear violation of section 2-1106, the circuit court was made aware of it, and I would find that the circuit court's failure to ensure that the *voir dire* was conducted in accordance with law requires a new trial.

    [2]I believe that this a transcription error and that counsel for Bethalto and Imo's was indicating that the plaintiff was continuing to pass instructions to the nominal defendants on how to exercise their peremptory challenges and that time was being given for them to do so.

## 2. Imo's Liability

I also disagree with the majority's analysis that Imo's motion for a summary judgment, motion for a directed verdict, and motion for a judgment notwithstanding the verdict were properly denied. I believe the record is clear that Lyerla was not an employee or agent of Imo's, actual or apparent, did not owe a general duty to protect the plaintiff, and did not voluntarily assume such a duty. I will address each theory of liability in turn.

### a. *Respondeat Superior*–Actual Agency

"The doctrine of *respondeat superior* allows an injured party to hold a principal vicariously liable for the conduct of his or her agent." *O'Banner v. McDonald's Corp.*, 273 Ill. App. 3d 588, 592 (1995) (citing *Moy v. County of Cook*, 159 Ill. 2d 519, 523 (1994)), *rev'd on other grounds*, 173 Ill. 2d 208 (1996). "An agency relationship is a consensual one between two legal entities whereby: (1) the principal has the right to control the conduct of the agent, and (2) the agent has the power to affect the legal relations of the principal." *Id.* "Whether an actual agency has in fact been created is determined by the relations of the parties as they exist under their agreements or acts, with the question being ultimately one of intention." *Id.* (citing 3 Am. Jur. 2d *Agency* § 21 (1986)). "While the existence of any agency relationship is usually a question of fact, it becomes a question of law when the facts regarding the relationship are undisputed or no liability exists as a matter of law." *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 134 (2007). Here, I would find that, as a matter of law, Lyerla was not an actual agent of Imo's. Lyerla testified that he worked for Bethalto, that his paychecks came from Bethalto, and that Annette Wilson of Bethalto screened and hired him and was his supervisor. He never had contact with anyone from Imo's. There is no dispute that Lyerla and Imo's had no contractual relationship, and based on the various written agreements between Imo's and Lyerla's employer, Bethalto, it is clear that those entities intended to exclude any possibility of an agency relationship. See *id.* The franchising agreement specified that Imo's and Bethalto are independent contractors and required Bethalto to conspicuously identify itself at the premises of the store and in all dealings with the public as an independently owned business. In addition, the operating manual stated that Bethalto was responsible for its own day-to-day operations and the hiring, training, and supervision of its employees. It also contained an indemnification clause requiring Bethalto to indemnify Imo's from any and all liability arising out of the acts or omissions of Bethalto's employees, and a mandatory insurance provision requiring Bethalto to maintain insurance, with Imo's named as an additional insured, for its drivers' liability as well as workers' compensation.

Moreover, I find no evidence in this record to support a finding that the conduct of Imo's and Lyerla, or Lyerla's employer, Bethalto, demonstrated Imo's actual control over Lyerla or the day-to-day operations of Bethalto sufficient to negate the intent of the franchise agreement not to create a principal-agent relationship. See *id.*; see also *Salisbury v. Chapman Realty*, 124 Ill. App. 3d 1057, 1061 (1984). While the manual provided general system standards for Bethalto to follow, it has been recognized that inherent in any franchise agreement is the need to protect the name, goodwill, reputation, and the trademarks and service marks it creates, and the mere protection of a trade name does not create an agency

relationship. *Oliveira-Brooks*, 372 Ill. App. 3d at 135. An actual agency relationship did not exist as a matter of law, and I believe the majority's analysis to the contrary improperly focuses on Imo's right to make recommendations and impose requirements on Bethalto as a franchisee, rather than its relationship with the negligent party, Lyerla. For these reasons, I would find that the circuit court erred in denying Imo's motion for a summary judgment, directed verdict, and judgment notwithstanding the verdict as to the issue of *respondeat superior* based on actual agency.

¶ 182                    b. *Respondeat Superior*–Apparent Agency

¶ 183     I next consider whether Imo's was entitled to a summary judgment, a directed verdict, and a judgment notwithstanding the verdict on the issue of its vicarious liability for Lyerla's conduct based on the doctrine of apparent agency. Apparent agency is based on principles of estoppel. *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 213 (1996). "The idea is that if a principal creates the appearance that someone is his agent, he should not then be permitted to deny the agency if an innocent third party reasonably relies on the apparent agency and is harmed as a result." *Id.* Accordingly, a principal can be held vicariously liable in tort for injury caused by the negligent acts of his apparent agent if the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency. *Id.* It is clear from the record before us that the plaintiff's injury is in no way related to his reliance on Lyerla being an apparent agent of Imo's. The plaintiff was injured in an automobile accident that occurred randomly on a public roadway. The doctrine of apparent agency is, as a matter of law, inapplicable to the case at bar, and Imo's was entitled to a summary judgment, directed verdict, and judgment notwithstanding the verdict on the theory that Lyerla was an apparent agent of Imo's.

¶ 184                              c. Direct Negligence

¶ 185     Having found no basis for vicarious liability on the part of Imo's for the acts of Lyerla, I also believe Imo's was entitled to a summary judgment, directed verdict, and judgment notwithstanding the verdict on the issue of its direct liability to the plaintiff for the injuries he sustained in this automobile accident because Imo's owed no duty to protect the plaintiff from the injuries he sustained in this accident. I respectfully submit that the majority does not follow the analysis of duty required by the Illinois Supreme Court in *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 21, because the majority does not make a legal determination of the threshold question as to whether Imo's committed an act or omission that contributed to a risk of harm to the plaintiff prior to weighing the factors of foreseeability, likelihood of injury, and the burden on the defendant. Instead, the majority accepts the plaintiff's allegations as true and moves directly into an analysis of the four factors. These allegations are that Imo's contributed to a risk of harm to the plaintiff by: (1) requiring Bethalto to engage in pizza delivery; (2) establishing an unusually large delivery area for the Bethalto store; (3) requiring "timely" delivery; (4) requiring Bethalto to have Lyerla sign a contract stating that he could be terminated for failing to deliver pizzas expeditiously; and (5) creating a financial incentive for drivers to drive at unsafe speeds. Having considered the entire record, I believe that these alleged actions on the part of Imo's are insufficient, in law and in fact, to support a finding that Imo's contributed to a risk of harm to the plaintiff, and I consider them each in turn.

¶ 186    I begin with the contention that Imo's requirement that its franchisees engage in pizza delivery constitutes an act that contributed to a risk of harm to the plaintiff. I would decline to so hold. All of the cases cited by the plaintiff in support of its contention that Imo's requirement that franchisees engage in pizza delivery contributed to a risk of harm to the plaintiff involved entities that directly created a uniquely dangerous situation. See, *e.g.*, *Michel v. O'Connor*, 26 Ill. App. 2d 255 (1960) (motorcycle club racing event on a frozen lake). In this case, requiring franchisees to deliver is tantamount to a requirement that the franchisees engage in an everyday activity: operating a vehicle on a public roadway. I cannot support a holding that any franchisor who proposes a business model involving delivery of food assumes a duty to all motorists who come into contact with its franchisees' employees.

¶ 187    Next I consider the plaintiff's contention that because Imo's created a large delivery area for the Bethalto store, it contributed to a risk of harm to the plaintiff. I find this contention to be belied by the record. Imo's assigned a protected delivery territory of a three-quarter-mile radius from each franchise in which that store is guaranteed to operate without the competition of other Imo's restaurants. Individual franchisees were allowed to operate outside of the assigned delivery territory at their discretion as long as they did not operate within the protected territory of another Imo's franchise. Bethalto's owner, Mrs. Wilson, testified at trial that she chose to deliver to a larger area than that assigned by Imo's at her own discretion. Accordingly, I find no act on the part of Imo's in relation to the delivery area that would have contributed to any risk of harm to the plaintiff.

¶ 188    I now turn to the plaintiff's contention that Imo's required "timely delivery" on the part of franchisees, which contributed to a risk of harm to the plaintiff. My examination of the record also belies this assertion. The manual is replete with references to the quality of the product and the safety of delivery above all else. The manual states: "When a customer calls, it is important they get a made-to-order pizza as soon as possible. But we would never sacrifice quality for speed." In addition, the manual explicitly states, "You must never advertise or stipulate to drivers that a delivery must be accomplished within a specified time of when an order is received." Finally, all references to "timely" or "efficient" delivery in the driver contract form in the manual equally emphasize safety. I would decline to impose a duty based on the language of the manual, which does not require franchisees to deliver within any specific time frame.

¶ 189    For the same reasons, I do not find that Imo's created a risk of harm to the plaintiff by requiring Bethalto to utilize a driver contract stating that a driver could be terminated for failing to deliver pizzas expeditiously. Imo's had no authority to terminate Lyerla's employment with Bethalto for any reason. The manual stated that each franchisee was solely responsible for establishing its own employment practices and guidelines for hiring drivers, and Imo's had no right to control the franchisee's employees. Bethalto's owner, Mrs. Wilson, testified that she was responsible for hiring, supervising, and disciplining Bethalto's employees without any involvement from Imo's. Again, any requirement that a delivery be made "timely" was qualified by the requirement that the delivery also be made safely. The driver contract stated:

> "Should Driver at any time, refuse, neglect, or fail in any respect to perform the work with safety and expedition, or default in the performance of this Agreement, then Company, without prejudice to any other right or remedy, may terminate Driver's services under this agreement or oral or written notice to Driver."

- 36 -

¶ 190        The driver contract consistently emphasized safety above all, stating that:

"Driver acknowledges Company's policy that the safety of the Driver and others is of primary concern and that Driver will not jeopardize his or her safety of others for any reason."

¶ 191        The safe work practices for drivers states in capitalized text:

"KEEP IN MIND THAT YOUR PRIMARY OBJECTIVE IS YOUR SAFETY AND THE SAFETY OF OTHERS. DON'T EVER PUT ANYTHING AHEAD OF SAFETY. Driver agrees to use his or her best efforts to deliver the pizzas and other menu items in a good workmanlike manner in a timely fashion, taking all safety precautions and obeying all laws. *** Driver acknowledges Company's policy that the safety of Driver and others is of primary concern and that Driver will not jeopardize his or her safety or the safety of others for any reason. Driver will at all times wear a seat belt and operate his or her motor vehicle in a safe manner, in accordance will all laws and rules of the road. *** Driver acknowledges that Company is a franchisee of Imo's Franchising Inc. and that his/her employment is only with Company, and not Imo's Franchising, Inc."

¶ 192        I would find that the driver contract required by Imo's did not contribute to a risk of harm to the plaintiff.

¶ 193        Finally, I consider whether Imo's suggestions for methods its franchisees could use to compensate their drivers created a risk of harm to the plaintiff. These suggestions included allowing the drivers to keep all or part of the delivery fee charged for each delivery, allowing the drivers to keep all or part of any tips that were given, paying the drivers an hourly wage, and compensating drivers with a gas or mileage allowance, or any combination of those methods. Franchisees such as Bethalto could choose to adopt any or all of these methods of compensation for its drivers or pay its drivers according to its own policies. The only requirement that Imo's imposed is that drivers make at least minimum wage. This requirement was imposed on Bethalto and not the drivers. I find nothing in Imo's suggestions for compensating drivers that increased the risk of harm to the plaintiff.

¶ 194        Generally, businesses do not owe an affirmative duty to protect or rescue a stranger, but must guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act. *Simpkins*, 2012 IL 110662, ¶ 19. Here, I have examined all of the plaintiff's contentions in this regard and have found no act or omission on the part of Imo's that contributed to a risk of harm to the plaintiff. Because Imo's has not created a risk of harm to the plaintiff, a duty on the part of Imo's to guard against the plaintiff's injuries arises only if a legally recognized "special relationship" existed between them. See *id.* ¶ 21. No such relationship exists in this case.

¶ 195        The remaining theory of direct liability that I must address is the majority's finding that Imo's voluntarily assumed a duty to protect the plaintiff when it imposed qualifications for drivers on Bethalto and then reserved the right to make inspections and inquiries and to enforce compliance with suggestions or requirements set forth in the manual. I find no support for this assertion under existing case law. The manual made clear that its minimum driver's qualifications were imposed by insurance. It is also important to note that the statements in the manual regarding the right to make inspections made no specific mention of the driver's qualifications, and I believe it is important to set forth this language in detail:

"In order to maintain the public image and reputation of the Imo's Pizza System, and to maintain standards of quality, appearance and service of Imo's franchises, we may use various methods to monitor each franchisee's compliance with the high Imo's Pizza System standards. Such methods include, but are not limited to: **Store inspections/Inquiries**–*We have the right to make inspections and inquiries of your store during normal business hours without notice. If we find areas that need improvement, we have the right to make certain recommendations and suggestions to you, and in some cases, we may require you to make certain changes or improvements. You agree to make those changes and improvements that we may require of you. \*\*\* You and your employees must cooperate with us and provide us with any requested information in connection with such inspections and inquiries. Any suggestions, recommendations, or requirements we may impose as a result of our inspections is not a substitute for your responsibility, as the franchisee, for the manner and means by which the day-to-day operations of your Imo's pizza parlor is conducted. Furthermore, we do not warrant the appropriateness of any such suggestions, recommendations, or requirements.*" (Emphasis in original.)

¶ 196    Although Imo's made its driver qualifications mandatory due to the imposition of these requirements by insurance, and Imo's reserved a right to inspect and monitor Bethalto's compliance with the manual in general, Imo's did not specifically reserve the right to micromanage Bethalto's employment records and did not take any affirmative action to ensure compliance with the standards for drivers. See *Chelkova v. Southland Corp.*, 331 Ill. App. 3d 716, 724 (2002) (franchisor did not exercise control over franchisee day-to-day operations and did nothing to enforce its security recommendations); accord *Decker v. Domino's Pizza, Inc.*, 268 Ill. App. 3d 521, 528 (1994) (franchisor created a franchise consultant to ensure compliance with its security standards), and *Martin v. McDonald's Corp.*, 213 Ill. App. 3d 487, 491 (1991) (franchisor checked for security problems at franchisee stores through a regional security manager who would follow up on whether recommended security procedures had been followed). The record reflects that Imo's never undertook to inspect Bethalto's records for compliance with the insurance requirements regarding drivers' qualifications or to monitor Bethalto in any fashion. With regard to hiring and managing employees, the manual provided:

"[S]ince you control day to day operations of your business, you are responsible for the acts of your employees \*\*\*. You are solely responsible for all employment decisions and functions of your store, including hiring, firing, training, wage and hour requirements, recordkeeping, supervising and disciplining of your employees. \*\*\* We do not have any responsibility or duty to implement a training program for your employees and we do not have a responsibility or duty to instruct your employees about matters of safety and security in your Store or in your delivery area. You are solely responsible for recruiting, hiring, training, scheduling for work, supervising and paying those who work in your Store, and they shall for all purposes be considered your employees, and not our agents or employees. We expressly disclaim any right to control your employees, and again reiterate that the control of your employees rests solely with you as the franchisee and owner and operator of your Store. We neither have the right nor will ever be in a position to control the manner and method of hiring or supervising your employees. By providing advice or

suggestions with respect to your employees, or by providing any advice or suggestions with respect to other matters affecting the operations of your Store, or by providing you forms that we have developed, we do not assume any of your responsibilities or duties."

¶ 197    I would decline to hold that the reservation of a right to monitor a franchisee is tantamount to a voluntary undertaking to do so. I also note that a failure to inspect Bethalto's records or negligent inspection of Bethalto's records was not pled in the complaint as a basis for Imo's alleged negligence. For all of these reasons, I would find that, as a matter of law, Imo's did not owe a duty to the plaintiff in this case, and was entitled to a summary judgment, directed verdict, and judgment notwithstanding the verdict on the plaintiff's direct negligence claim against it.

¶ 198                    3. Questioning by the Circuit Court on Issue of Imo's Liability

¶ 199    Finally, although I would find that Imo's is entitled to a judgment as a matter of law in its favor because it had no duty to protect the plaintiff from the conduct of Bethalto's employee, I also believe that the circuit court's questioning of one of the owners of Bethalto Pizza, Annette Wilson, during defense counsel's examination of her indicated bias on its part regarding the issue of Imo's liability and constitutes reversible error. Mrs. Wilson testified that she made the decisions to hire drivers for Bethalto Pizza and sat in on interviews and that no representative of Imo's participated. As far as operations of Bethalto Pizza, Mrs. Wilson testified that Imo's had no involvement. At this point, the circuit court had the following colloquy with Mrs. Wilson during counsel for Imo's examination:

"THE COURT: You really just rented the Imo name, have you not?

THE WITNESS: Pretty much.

THE COURT: Without Imo there couldn't be you; without you there couldn't be a driver, so no one is responsible?

THE WITNESS: Well, I have taken the responsibility.

THE COURT: How about Imo?

THE WITNESS: I don't–I don't see how they could possibly be responsible.

THE COURT: Have you discussed this with Imo?

THE WITNESS: Have I discussed what with Imo?

THE COURT: This case. You are–I know you are going to object, and the objection is overruled. But ask your next question.

COUNSEL: I was not going to object, Your Honor.

THE COURT: Come on. Let's get to the meat of this case.

COUNSEL: I'll move on.

THE COURT: Is there an agency relationship?

WITNESS: Is there what?

THE COURT: An agency relationship?

COUNSEL: Between Bethalto Pizza and the driver?

THE COURT: I just asked the general question. Is there an agency relationship?

THE WITNESS: Between the store and Imo?

- 39 -

THE COURT: You can't answer that, right?

THE WITNESS: I don't–I don't understand the question.

THE COURT: Yes. You don't–

THE COURT: There's been a lot I don't understand. You get a pack of material an inch thick?

THE WITNESS: Right. Right.

THE COURT: It seems like no one has read it.

THE WITNESS: I have read it, but I did not memorize it.

THE COURT: And Mrs. Imo, she doesn't know anything about it either. And it's getting to the point where this trial I do have a responsibility as a judge to keep this case going. There's been a lot of wasted time, and there's been a lot of denying. Let's get to the point. Go ahead.

COUNSEL: Okay. And your Bethalto Pizza is not denying that Ken worked for them at the time of the accident, correct?

THE WITNESS: That's correct.

COUNSEL: Okay. He was–to your understanding he was driving pizzas in the course of his employment at the time of the accident?

THE WITNESS: That's correct.

COUNSEL: And as far as the relationship with Imo they don't have any direct control over day-to-day operations?

THE WITNESS: No. I own the franchise.

COUNSEL: Okay. All right. That's all the questions I have.

THE COURT: You're lucky."

¶ 200    I respectfully dissent from the majority's characterization of this line of questioning on the part of the circuit court. I do not believe that the circuit court's remarks "could have been just as easily said in jest" or that they are ambiguous in meaning. Nor do I believe that the remarks could also be viewed as a summation of Mrs. Wilson's testimony. Instead, I believe the questioning indicated bias on the part of the circuit court regarding Imo's liability for the plaintiff's injuries, and deprived Imo's of a fair trial.

¶ 201    In conclusion, and for all of the foregoing reasons, I would vacate the judgment against Imo's and remand with directions that judgment be entered in its favor. Furthermore, I would reverse the judgment against Bethalto and remand for a new trial on damages, as Bethalto has admitted its vicarious liability for Lyerla's admitted negligence.